*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION:  2000 FED App. 0123P (6th Cir.)
File Name:  00a0123p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

KELLOGG COMPANY,
*Plaintiff-Appellant/*
*Cross-Appellee,*

*v.*

EXXON CORPORATION,
*Defendant-Appellee/*
*Cross-Appellant.*



Nos. 98-6237/6360

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 96-03070—Julia S. Gibbons, Chief District Judge.

Argued:  September 14, 1999

Decided and Filed:  April 6, 2000

Before:  BATCHELDER and GILMAN, Circuit Judges;
HOOD,* District Judge.

---

* The Honorable Denise Page Hood, United States District Judge for the Eastern District of Michigan, sitting by designation.

1

_____

### COUNSEL

**ARGUED:** Daniel S. Mason, San Francisco, California, for Appellant. Louis T. Pirkey, ARNOLD, WHITE & DURKEE, Austin, Texas, for Appellee. **ON BRIEF:** Daniel S. Mason, San Francisco, California, Grady M. Garrison, BAKER, DONELSON, BEARMAN & CALDWELL, Memphis, Tennessee, Christopher T. Micheletti, FURTH, FAHRNER & MASON, San Francisco, California, for Appellant. Louis T. Pirkey, Stephen P. Meleen, William G. Barber, ARNOLD, WHITE & DURKEE, Austin, Texas, Buckner P. Wellford, John J. Thomason, THOMASON, HENDRIX, HARVEY, JOHNSON & MITCHELL, Memphis, Tennessee, Robert D. Rippe, Jr., Charles A. Beach, EXXON CORPORATION, Irving, Texas, Christopher T. Micheletti, FURTH, FAHRNER & MASON, San Francisco, California, for Appellee.

_____

### OPINION

_____

ALICE M. BATCHELDER, Circuit Judge. Plaintiff-Appellant Kellogg Company appeals the district court's order granting summary judgment to Defendant-Appellee Exxon Corporation on Kellogg's complaint alleging federal and state law claims of trademark infringement, false designation of origin, false representation, dilution, and unfair competition. Because we conclude that the district court erred in (1) holding that Kellogg had acquiesced in Exxon's use of the challenged mark, (2) dismissing Kellogg's dilution claim, and (3) holding that no genuine issues of fact material to Kellogg's claim of abandonment remain for trial, we reverse the judgment of the district court and remand the case for further proceedings.

### CONCLUSION

Accordingly, we REVERSE the judgment of the district court granting summary judgment to Exxon on Kellogg's claims of infringement, dilution, and abandonment, we VACATE the grant of summary judgment to Exxon on Kellogg's claimed grounds of progressive encroachment, and REMAND the case for further proceedings consistent with this opinion.

amended by the Federal Trademark Dilution Act of 1995, states:

> The term "dilution" means the lessening of the capacity of a famous mark to identify and distinguish goods and services, *regardless of the presence or absence of -- (1) competition between the owner of the famous mark and other parties, or   (2) likelihood of confusion, mistake or deception*.

15 U.S.C. § 1127 (emphasis added).[4]

The federal cause of action for dilution is found in 15 U.S.C. § 1125(c)(1). For a plaintiff to succeed on a federal claim of dilution "(1) the senior mark must be famous; (2) it must be distinctive; (3) the junior use must be a commercial use in commerce; (4) it must begin after the senior mark has become famous; and (5) it must cause dilution of the distinctive quality of the senior mark." *Nabisco, Inc. v. PF Brands, Inc.,* 191 F.3d 208, 215 (2d Cir. 1999); *see also Syndicate Sales, Inc. v. Hampshire Paper Corp.,* 192 F.3d 633, No. 98-4217, 1999 WL 707786, at *5 (7th Cir. Sept. 13, 1999); *Ringling Bros.-Barnum & Bailey Combined Shows, Inc. v. Utah Div. of Travel Dev.,* 170 F.3d 449, 452 (4th Cir. 1999), *cert. denied,* 120 S.Ct. 286 (1999); *I.P. Lund Trading v. Kohler Co.,* 163 F.3d 27, 45-50 (1st Cir.1998); *Panavision Int'l v. Toeppen,* 141 F.3d 1316, 1324 (9th Cir. 1998).

We hold that the district court's dismissal of Kellogg's dilution claims was improper. Because we hold that Kellogg's infringement claim is not in fact barred by acquiescence, we also hold that the district court's dismissal of Kellogg's bad faith infringement claim was improper.

---

[4]The Tennessee statute controlling Kellogg's state dilution claim applies "notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services." TENN. CODE ANN. § 47-25-512 (1998).

## BACKGROUND

In 1952, Kellogg began using a cartoon tiger in connection with "Kellogg's Frosted Flakes" cereal and registered its "Tony The Tiger" name and illustration in the United States Patent and Trademark Office ("PTO"). Today, Kellogg owns a number of federal trademark registrations for the name and appearance of its "Tony The Tiger" trademark; those trademark registrations cover, among other things, "cereal-derived food product to be used as a breakfast food, snack food or ingredient for making food."

In 1959, Exxon began using a cartoon tiger to promote motor fuel products, and in 1965, Exxon registered federally its "Whimsical Tiger" for use in connection with the sale of petroleum products. Exxon used its cartoon tiger in its "Put A Tiger In Your Tank" advertising campaign, which ran between 1964 and 1968. In 1968, Kellogg acknowledged Exxon's use of its cartoon tiger when it requested Exxon not to oppose Kellogg's application to register its "Tony The Tiger" trademark in Germany. Exxon's "Whimsical Tiger" trademark, obtained with no opposition from Kellogg, became incontestable in 1970.

In 1972, Exxon changed its name from Standard Oil Company to Exxon Corporation and changed its primary trademarks from "Esso," "Enco", and "Humble" to "Exxon." Exxon submitted into evidence numerous newspaper and magazine articles and other promotional materials demonstrating its extensive and costly advertising campaign to promote its new "Exxon" mark using the cartoon tiger and to launch its "Energy For A Strong America" campaign, which ran in the latter half of the 1970s. For example, an article in a 1973 issue of *Advertising Age* called Exxon's advertising campaign "the classic 'name change' campaign of all time, with approximately $100,000,000 involved in the face lift!" Harry Wayne McMahan, *McMahan Picks the 100 Best TV Commercials of the Year*, ADVERTISING AGE, Feb. 19, 1973.

In the early 1980s, Exxon's advertising agency, McCann-Erickson ("McCann"), suggested that Exxon phase out the use of its cartoon tiger and begin using a live tiger, opining that the cartoon tiger was too whimsical and, hence, inappropriate in light of prevalent oil shortages. In 1981, Exxon began to adopt a new look for its gas stations, implementing a program to modernize the gas pumps and to eliminate its cartoon tiger on the pump panels. At that time, Exxon had between 16,000 and 18,000 gas stations in the United States. Over 11,000 of these gas stations were owned and operated by independent distributors ("distributor stations"), and the rest were owned and operated by Exxon ("company operated retail stores" or "CORS") or owned by Exxon and operated by independent dealers ("dealer stations"). The modernization program to bring about this "new look" entailed removal of the cartoon tiger head design from the lower panels or "pump skirts" on its Exxon "Extra" gasoline dispensers. In a letter dated August 12, 1982, Exxon instructed its regional managers to begin phasing out their use of the cartoon tiger:

> The purpose of this memo is to communicate new guidelines pertaining to the application of the Exxon Tiger and the Exxon Emblem in all advertising, point-of-sale material, Company publications, etc.

> Exxon Tiger--Effective immediately, the use of the cartoon tiger is to be discontinued.

Exxon explored possible ways to protect its cartoon tiger trademark while shifting toward a live tiger. For example, a 1984 internal office memo suggested:

> Since the only way to protect the Trademark is to use it, it might be wise for us to explore ways that the Cartoon Tiger can be used in marketing on a limited basis. This is not a hot item, but one that we can't forget about and be embarrassed later.

A 1985 internal office memo, which listed the subject as "Trademarks," stated:

The district court held that Kellogg had failed to produce evidence of nonuse—the only element of abandonment that Exxon's motion for summary judgment addressed—and that Exxon was therefore entitled to summary judgment on Kellogg's abandonment claim. Our review of the record, however, persuades us that there remain for trial genuine issues of material fact with regard to whether Exxon's use of its cartoon tiger during the 1980s was bona fide or simply a sham to protect its rights in the mark. Because we have held as a matter of law that Kellogg did not acquiesce in Exxon's use of its cartoon tiger in connection with the sale of non-petroleum products, Kellogg's abandonment claim with regard to Exxon's affirmative defense of acquiescence is moot. But because the abandonment claim may yet be germane to the issues remaining for trial, we conclude that the summary judgment in favor of Exxon on this claim must be reversed.

### C. Kellogg's Remaining Claims

In granting Exxon's motion for summary judgment, the district court, in a footnote, dismissed Kellogg's remaining claims as moot:

> The dismissal of Kellogg's action renders moot the following pending motions: Exxon's renewed motion for partial summary judgment on Kellogg's state dilution claim; Exxon's motion for partial summary judgment on Kellogg's dilution by tarnishment claims; Exxon's motion for partial summary judgment on the issue of bad faith; and Exxon's motion for summary judgment on Kellogg's federal dilution claim.

The short shrift given to Kellogg's dilution claims ignores the fact that dilution rests on legal grounds entirely distinct from the law governing infringement. In granting Exxon's motion for summary judgment, the district court held that the connection between the products offered by Kellogg and those offered by Exxon and the respective marketing channels for those products were too attenuated for the parties to be considered competitors. However, the Lanham Act, as

including acts of omission as well as commission, causes the mark to become the generic name for the goods or services on or in connection with which it is used or otherwise to lose its significance as a mark. Purchaser motivation shall not be a test for determining abandonment under this paragraph.

15 U.S.C. § 1127.

In order for a party to succeed on a claim of abandonment, it must prove the elements of both non-use and intent, *i.e.*, that the other party actually abandoned its mark through non-use and that it intended to do so. *See United States Jaycees v. Philadelphia Jaycees*, 639 F.2d 134, 138 (3d Cir. 1981) ("To establish the defense of abandonment it is necessary to show not only acts indicating a practical abandonment, but an actual intent to abandon.") (internal quotation marks and citation omitted); *Citibank v. Citibanc Group, Inc.*, 724 F.2d 1540, 1545 (5th Cir. 1984) (citing *Jaycees* and holding that abandonment requires a showing of non-use and intent to abandon and that the claimant bears a high burden of proof); *Prudential Ins. Co.,* 694 F.2d at 1156 (same).

Kellogg argues that Exxon abandoned its "bona fide" use of the cartoon tiger during the 1970s and 1980s, and that Exxon therefore may not rely on its use of the cartoon tiger mark prior to 1991—when Exxon reintroduced the tiger to promote convenience store food and beverage sales—to support its affirmative defenses to Kellogg's infringement claims. Kellogg asserts that even if Exxon presented evidence to establish that its use of the cartoon tiger was fairly continuous, albeit regionally limited, throughout the 1980s, Exxon's use of its cartoon tiger in the 1980s was not "bona fide" but, rather, "made merely to reserve a right in [the] mark." 15 U.S.C. § 1127. *See Exxon Corp. v. Humble Exploration Co., Inc.*, 695 F.2d 96, 99-100 (5th Cir. 1983) (recognizing that sham use of a trademark—one instituted solely for the purposes of maintaining trademark rights—does not qualify as a "bona fide" use under the statute).

Advertising discontinued use of the "Cartoon Tiger" in all advertising, point-of-sale material and company publications on August 12, 1982. Regions were advised at that time to do the same (see letter attached). To my knowledge, there has been no use of the "Cartoon Tiger" by advertising or [in] the areas other than the tiger head which appears on the pre-RID Trimline Exxon Extra gasoline pumps/dispensers.

We have asked McCann to explore ways that the "Cartoon Tiger" could be used to protect the mark. In reviewing possible station applications, two general areas seem to afford the most opportunities . . . .

This memo discussed possible strategic placement of cartoon tiger decals around the pump islands and sales rooms/kiosks. Other correspondence between Exxon's attorneys, Exxon's marketing department, and McCann reveals Exxon's efforts to reduce its use of the cartoon tiger while ensuring trademark protection. Exxon ultimately decided to use its cartoon tiger as a graphic display on its stations' pump toppers.

Many Exxon stations were slow to remove the cartoon tiger from their pumps. In late 1985 and early 1986, Exxon was using its cartoon tiger on pump toppers at approximately 2,500 gas stations. In 1987, Exxon photographed every distributor station in the United States. Thousands of photographs were taken and stored at Exxon, but most of them were destroyed in a 1994 routine file room clean-up. Based upon those photographs that remain, Exxon estimates that approximately 10% of the 11,000 distributor stations still displayed the cartoon tiger in 1987. In 1993, Exxon contractually obligated its distributors to comply with the modernization program and to convert their stations to the "new look," threatening to remove from the Exxon chain those stations that failed to comply by April 1, 1995.

Exxon submitted evidence in an effort to show that, despite its efforts to convert the look of its gas stations and shift toward the use of a live tiger, its use of the cartoon tiger throughout the 1980s was sufficient to maintain its rights in

the mark. In November 1985, Exxon had renewed its federal trademark registration for its cartoon tiger; this renewal would last an additional 20 years. From 1985 to 1990, some Exxon stations used a costumed version of the cartoon tiger for appearances at grand opening events and various promotional activities. In late 1989 and again in 1993, Exxon ran a promotion called "Color to Win," in which over one million contestants submitted entries of a cartoon tiger to hundreds of Exxon stations. In the early 1990s, Exxon used its cartoon tiger to promote the Texas State Fair. Exxon also presented evidence showing that in 1973, an Exxon distributor in Virginia placed a large statue of a cartoon tiger in front of its gas station near the highway, and the statue remains there today.

In the early 1990s, after the *Exxon Valdez* oil spill, Exxon changed the appearance of its cartoon tiger, making it "more endearing, warm, and friendly." In the words of Exxon's principal artist, "Today's tiger is now cast in a more humanitarian role. He is polite to the elderly, plants trees for ecology and has an overall concern for the environment." Exxon also began to expand the use of its cartoon tiger. Although Exxon had opened its first company-operated convenience store in 1984, it was not until the early 1990s that Exxon began to use its cartoon tiger to promote the sale in those stores of certain foods and beverages, such as Domino's Pizza, Coca Cola, Pepsi Cola, Lays Potato Chips, and Dunkin Donuts. Exxon also began using its cartoon tiger to promote its own private label beverage, "Wild Tiger," and its own private label coffee, "Bengal Traders."

Exxon's use of the cartoon tiger to promote food, beverages, and convenience stores increased dramatically from 1992 to 1996. In October 1992, Exxon had about eight "Tiger Mart" stores; by October 1993, there were about 68 "Tiger Mart" stores; by October 1996, there were over 265 "Tiger Mart" stores.

On November 3, 1992, having learned of Exxon's reintroduction of its cartoon tiger in Canada and Argentina,

suit in the first place, and no infringing conduct in which the plaintiff could have acquiesced. Put another way, if there is sufficient similarity between the products and connection between the marketing channels to start the clock running on the defendant's affirmative defense of acquiescence, then there is sufficient similarity and connection to permit the plaintiff to counter that defense with a showing of progressive encroachment.

Here, we have found as a matter of law that Kellogg did not acquiesce in Exxon's use of the cartoon tiger. Because progressive encroachment has relevance only to counter Exxon's claim of acquiescence, the district court erred in treating progressive encroachment as a claim independent of Exxon's acquiescence defense. Therefore, we will vacate the district court's grant of summary judgment to Exxon with regard to progressive encroachment; we note that the district court need not engage in a progressive encroachment analysis on remand.

### B. Abandonment

In addition to its progressive encroachment claim, Kellogg claimed that Exxon had abandoned the cartoon tiger mark. Kellogg's Complaint recites Exxon's pending application to register a service mark depicting the cartoon tiger, called "Hungry Tiger & Design;" the Complaint raises as a separate claim for relief that Exxon abandoned its use of the cartoon tiger and demands a declaratory judgment to that effect.

Abandonment is defined in § 1127 of the Lanham Act:

A mark shall be deemed to be "abandoned" if either of the following occurs: (1) When its use has been discontinued with intent not to resume such use. Intent not to resume may be inferred from circumstances. Nonuse for 3 consecutive years shall be prima facie evidence of abandonment. "Use" of a mark means the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark. (2) When any course of conduct of the owner,

reverse the district court's grant of summary judgment to Exxon on the infringement claim and remand this matter for trial on the merits of that claim.

We turn next to the district court's conclusion, based largely on the *Prudential* decision, that "direct competition" was dispositive of Kellogg's progressive encroachment claim:

> Although Exxon has entered into the convenient market food sales arena, Exxon has not become a manufacturer or distributor of food items. Exxon's "product" is a retail convenience store engaged in the business of selling food on the premises of gasoline service stations. Kellogg's "product" for the purposes of this case is cereal. Although, Exxon may sell Kellogg's cereal product in the Tiger Mart or Tiger Express stores, this fact alone does not establish that the parties are competitors in the same or even a related market. Even if there is actual confusion between the Kellogg and Exxon cartoon tiger trademarks, connection between the parties' products and marketing channels for the sale of their products is too attenuated to support Kellogg's claim of progressive encroachment.

*Kellogg,* 50 U.S.P.Q.2d at 1507. In ruling, without engaging in any analysis of the likelihood of confusion, that progressive encroachment requires "direct competition" of identical products, the district court erred as a matter of law. The district court held that (1) a plaintiff who failed to bring suit when it first learned of the defendant's infringing use of plaintiff's mark has acquiesced in the defendant's infringing use, but (2) the plaintiff does not have a meritorious claim of progressive encroachment because the parties' products are dissimilar and the connection between their marketing channels is attenuated. These two propositions are fundamentally irreconcilable. If the second were true, there could be no likelihood of confusion; without a likelihood of confusion, the plaintiff would not have a provable claim of infringement; in the absence of a provable claim of infringement, there would be no basis for the plaintiff's filing

Kellogg's trademark counsel complained about that use in a telephone conversation with an Exxon attorney and was advised that Exxon had been using its cartoon tiger in the United States as well. Kellogg immediately requested examples of such use, and on November 20, 1992, Exxon sent Kellogg a compilation of 14 examples of promotional materials appearing in the United States featuring its cartoon tiger. Not one of those examples disclosed Exxon's use of its cartoon tiger to promote food and beverage items or its new "Tiger Mart" stores.

In 1993, Kellogg challenged Exxon's use of the cartoon tiger in Canada, and in 1994, filed a lawsuit against Exxon's Canadian affiliate. Kellogg was unsuccessful in its attempt to negotiate a global settlement in 1994 and 1995. In March 1996, Exxon published for opposition its application to the PTO to register its cartoon tiger for use with convenience stores, and Kellogg commenced opposition proceedings. On October 7, 1996, Kellogg filed suit against Exxon in the United States District Court for the Western District of Tennessee. Kellogg originally sought actual and punitive damages derived from Exxon's use of its cartoon tiger trademark in connection with the sale of food items, as well as a preliminary and permanent injunction to prohibit Exxon's continued use of its cartoon tiger in connection with the sale of food items on the ground that it unlawfully infringed upon and diluted Kellogg's "Tony The Tiger" mark. Exxon moved for summary judgment on the infringement claim based on its affirmative defense of acquiescence, and for partial summary judgment on Kellogg's claims of abandonment and progressive encroachment. The district court granted these motions and, holding that its decision rendered all remaining motions moot, dismissed Kellogg's bad faith infringement and dilution claims. *See Kellogg Co. v. Exxon Corp.*, 50 U.S.P.Q.2d 1499, 1507 (W.D. Tenn. 1998).

Kellogg raises the following assignments of error on appeal: (1) the district court improperly granted summary judgment because Exxon presented no evidence that Kellogg acquiesced in Exxon's use of its cartoon tiger in connection

with the sale of non-petroleum products; (2) the district court improperly denied Kellogg's progressive encroachment claim because progressive encroachment is not limited by a requirement of "direct competition" and the district court failed to consider the likelihood of confusion between the marks; (3) the district court improperly denied Kellogg's abandonment claim because there are genuine issues of material fact with regard to whether Exxon's use of its cartoon tiger during the 1980s was bona fide or simply a sham to protect its rights in the mark; and (4) the district court improperly dismissed Kellogg's bad faith infringement and dilution claims as moot. In this appeal, Kellogg has abandoned its claim for damages and pursues only its claim for injunctive relief.[1]

## ANALYSIS

We review de novo a district court's order granting summary judgment. *See Avery v. King*, 110 F.3d 12, 13 (6th Cir. 1997). Summary judgment is appropriate when there exists "no genuine issue of material fact and . . . the moving

---

[1]Kellogg also sought declaratory relief pursuant to 28 U.S.C. §§ 2201, 2202, requesting that Exxon be required to abandon with prejudice its application for federal trademark registration of its "Hungry Tiger & Design" mark. Exxon filed a counterclaim pursuant to 15 U.S.C. § 1119 for declaratory judgment of its right to register federally its "Hungry Tiger & Design" mark, as well as its "Whimsical Tiger" and "Tiger Express" marks, based on its intent to use those marks to promote retail convenience store services rendered at gasoline stations. The district court did not rule on Exxon's counterclaim, stating only that Kellogg failed to put Exxon's use of the "Hungry Tiger" at issue in any of its dispositive motions before the court and that Exxon's creation and use of the "Hungry Tiger" is not determinative of Exxon's claim of acquiescence or Kellogg's claims of abandonment and progressive encroachment. The district court found in favor of Exxon in all respects and never addressed Exxon's counterclaim for declaratory judgment to register its marks. Because Exxon filed a timely notice of cross-appeal to preserve its right to reassert its counterclaim in the event that any portion of Kellogg's claims is remanded for further proceedings, and because we reverse the district court decision in its entirety, we note that Exxon is entitled to pursue its counterclaim on remand.

connection with food, beverages, and retail convenience stores.

> To defeat a suit for injunctive relief, a defendant must also prove elements of estoppel which requires more than a showing of mere silence on the part of the plaintiff; defendant must show that it had been misled by plaintiff through actual misrepresentations, affirmative acts of misconduct, intentional misleading silence, or conduct amounting to virtual abandonment of the trademark.

*SCI*, 748 F. Supp. at 1262. The record reflects a genuine factual dispute as to whether Kellogg was put on notice of such use by Exxon in the mid 1980s or the early 1990s; indeed, the evidence suggests that in 1992, when Kellogg requested examples of Exxon's then-current use of its cartoon tiger in the United States, Exxon did not include a single example of its cartoon tiger used in connection with the sale of food items, leading Kellogg to believe that Exxon's use of its cartoon tiger in the United States was limited to the promotion of petroleum products. But even if we were to assume for the sake of argument that Kellogg should have known as early as 1984, when Exxon opened its first convenience store, that Exxon was using the cartoon tiger to promote the sale of food products, Kellogg's failure to bring suit until 1996 was not "so outrageous, unreasonable and inexcusable as to constitute a virtual abandonment of its right" to seek injunctive relief with regard to the sale of non-petroleum products. *See University of Pittsburgh*, 686 F.2d at 1044-45. There simply is no evidence in this record that in waiting until 1996 to file its complaint, Kellogg actively consented to Exxon's use of its cartoon tiger in connection with the sale of non-petroleum products or that it engaged in some "affirmative conduct in the nature of an estoppel, or conduct amounting to 'virtual abandonment.' " *See Tandy*, 769 F.2d at 366 n.2 (internal citations omitted).

We therefore hold that, as a matter of law, Kellogg did not acquiesce in Exxon's use of its cartoon tiger in connection with the sale of non-petroleum products. Accordingly, we

opposition from Kellogg–and Kellogg did not file suit until 31 years later. *See Kellogg*, 50 U.S.P.Q.2d at 1505.

We think that the district court erred in this conclusion. The failure to oppose Exxon's registration of its tiger and the lapse of time from that event until the filing of this action are not dispositive here. Although Exxon did in fact register its "Whimsical Tiger" trademark in 1965—with no opposition from Kellogg—Exxon's trademark registration was for use in connection with the sale of petroleum products, a product and product market with which Kellogg had no connection. Exxon had used its cartoon tiger to promote petroleum sales and Kellogg used its trademark to promote food sales; the two marks peaceably co-existed, each catering to its own market. Because proof of the likelihood of confusion is necessary in any trademark infringement claim, Kellogg was not obligated to bring suit at that time in order to protect its trademark. It is undisputed, however, that at some point after registering its cartoon tiger in 1965, Exxon moved into the non-petroleum market of food, beverages, and retail convenience stores and used its cartoon tiger in connection with those sales. The point at which Exxon established itself in this non-petroleum market was the point at which Kellogg knew or should have known that it now had a provable claim for infringement; it was at this point that Kellogg's duty to defend its trademark was triggered, and it is from this point that any delay must be measured for purposes of determining laches or acquiescence. We hold that Exxon's 1965 registration was insufficient to put Kellogg on notice of Exxon's later use of its cartoon tiger in connection with the sale of non-petroleum products. The district court's failure to distinguish between Exxon's sale of petroleum and non-petroleum products resulted in the clearly erroneous conclusion that Kellogg acquiesced in Exxon's use of its cartoon tiger to promote any and all of its products.

Although Kellogg originally challenged Exxon's use of its cartoon tiger in connection with both petroleum and non-petroleum products, Kellogg now seeks injunctive relief only to prohibit Exxon's continued use of its cartoon tiger in

party is entitled to judgment as a matter of law." FED R. CIV. P. 56(c). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-8 (1986). The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial" such that a jury reasonably could find for the plaintiff. *Id.* at 250 (citing FED. R. CIV. P. 56(e)). However, it is for the jury and not the judge to weigh the evidence and draw inferences from the facts. *See id.* at 250. "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)); *see also Wathen v. General Electric Co.*, 115 F.3d 400, 403 (6th Cir. 1997) (holding that when reviewing a motion for summary judgment, the district court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party).

Kellogg alleged trademark infringement against Exxon in violation of § 1114 of the Lanham Act, which states:

> (1) Any person who shall, without the consent of the registrant–(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . . shall be liable in a civil action by the registrant for the remedies hereinafter provided.

15 U.S.C. § 1114(1). In *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275 (6th Cir. 1997), we set forth the elements necessary to succeed on a claim of trademark infringement.

> The touchstone of liability under § 1114 is whether the defendant's use of the disputed mark is likely to cause confusion among consumers regarding the origin of the

goods offered by the parties. When determining whether a likelihood of confusion exists, a court must examine and weigh the following eight factors:

1. strength of the senior mark;
2. relatedness of the goods or services;
3. similarity of the marks;
4. evidence of actual confusion;
5. marketing channels used;
6. likely degree of purchaser care;
7. the intent of defendant in selecting the mark; and
8. likelihood of expansion of the product lines.

When applying these factors to a given case, a court must remember that these factors imply no mathematical precision, but are simply a guide to help determine whether confusion is likely. They are also interrelated in effect. Each case presents its own complex set of circumstances and not all of these factors may be particularly helpful in any given case. But a thorough and analytical treatment must nevertheless be attempted. The ultimate question remains whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way.

*Id.* at 280 (internal quotation marks, citations, and alterations omitted). Thus, crucial to any trademark infringement claim is the plaintiff's ability to show a likelihood of confusion on some fundamental level.

### A.  Laches, Acquiescence and Progressive Encroachment

In its motion for summary judgment, Exxon asserted the affirmative defenses of laches and acquiescence. Although laches precludes a plaintiff from recovering damages, it does not bar injunctive relief. *See TWM Mfg. Co., Inc. v. Dura Corp.*, 592 F.2d 346, 349-50 (6th Cir. 1979) ("Laches alone does not foreclose a plaintiff's right in an infringement action to an injunction and damages after the filing of the suit. Only by proving the elements of estoppel may a defendant defeat

resulting from the defendant's moving into the same or similar market area and placing itself more squarely in competition with the plaintiff. This approach is consistent with the principle that the touchstone of liability for trademark infringement is the likelihood of confusion, not direct competition of identical products. Although direct competition of identical products certainly would make it easier for a plaintiff to show a likelihood of confusion, this factor alone is not dispositive of progressive encroachment. In evaluating a plaintiff's claim of progressive encroachment, a court must perform a likelihood of confusion analysis, informed by factors such as whether the defendant has brought itself more squarely into competition with the plaintiff, whether the defendant has made changes to its mark over the years so that it more closely resembles plaintiff's mark, whether the parties market to the same customers or area, and whether the parties sell products interchangeable in use.

In the case before us here, the district court held both that Kellogg had acquiesced in Exxon's use of the cartoon tiger and that Kellogg could not demonstrate progressive encroachment by Exxon on Kellogg's mark. We will address first the district court's holding that Kellogg acquiesced in Exxon's use of the cartoon tiger.

In granting Exxon's motion for summary judgment based on acquiescence, the district court held that Kellogg's remaining silent for a grossly extended period of time and refusing to facilitate the protection of its trademark constituted "conduct amounting to virtual abandonment" such that it acquiesced in Exxon's infringing use of its cartoon tiger. *See SCI*, 748 F. Supp. at 1262; *Tandy*, 769 F.2d at 366 n.2. Relying on the *Anheuser-Busch* decision,[3] the district court found that Kellogg similarly was "grossly remiss" in that Exxon registered its "Whimsical Tiger" in 1965–with no

---

[3] The time period that the *Anheuser-Busch* Court considered so grossly extended as to constitute acquiescence and bar injunctive relief was 31 years (1909 to 1940). *See Anheuser-Busch*, 175 F.2d at 374.

Manufacturers Screw Products to Stronghold Screw Products, and the plaintiff filed suit in 1948. *See id.* The district court held that the plaintiff was barred by laches because it knew of defendant's infringing use of its trademark as early as 1940 or 1941 and did not bring suit until 1948. *See id.* The Seventh Circuit reversed the district court under a theory of progressive encroachment, stating:

> Prior to 1946 there was no confusion among prospective customers that had come to the attention of plaintiff's officers. It was defendant's incorporation of the word "Stronghold" into its business name that *caused most of the confusion*. Defendant's course was "progressive * * * encroachment" and "such a course does not tend to arouse hostile action until it is fully developed."

*Independent Nail & Packing*, 205 F.2d at 927 (emphasis added) (citing *O. & W. Thum*, 245 F. at 623). In determining whether, for purposes of the defendant's laches defense, the plaintiff had unreasonably delayed in filing suit, the court did not consider the period prior to the defendant's incorporation of the word "Stronghold" into its business name, when there was little likelihood of confusion. Rather, the court determined when the likelihood of confusion began to loom large, considering such factors as the similarity in scope of the parties' geographic markets, the degree to which the parties contacted the same prospective customers and appealed to the same general users' market, and the interchangeability of the products the parties sold; the court calculated the reasonableness of the plaintiff's delay from that point. The court's finding of progressive encroachment was not dependent upon a finding of direct competition between identical products; rather the progressive encroachment finding involved a recognition that the defendant's increasing use of the challenged word was not actionable until it actually caused a likelihood of confusion.

It is clear from all of these cases that the progressive encroachment analysis turns not on the single question of direct competition, but rather, on the likelihood of confusion

such prospective relief."); *Tandy Corp. v. Malone & Hyde, Inc.*, 769 F.2d 362, 366 n.2 (6th Cir. 1985) (same). Because Kellogg withdrew its claim for actual and punitive damages, seeking injunctive relief only, the district court properly determined that laches was inapplicable and that Exxon must prove acquiescence.

Acquiescence, like laches, requires a "finding of conduct on the plaintiff's part that amounted to an assurance to the defendant, express or implied, that plaintiff would not assert his trademark rights against the defendant." *Elvis Presley Enter., Inc., v. Elvisly Yours, Inc.*, 936 F.2d 889, 894 (6th Cir. 1991) (quoting *Sweetheart Plastics, Inc. v. Detroit Forming, Inc.*, 743 F.2d 1039, 1046 (4th Cir. 1984)). Although both laches and acquiescence require proof that the party seeking to enforce its trademark rights has unreasonably delayed pursuing litigation and, as a result, materially prejudiced the alleged infringer, acquiescence requires more. *See Elvis*, 936 F.2d at 894 (holding that with acquiescence, "more is necessary than the ordinary requirement of showing unreasonable delay and prejudice to the defendant"); *Tandy*, 769 F.2d at 366 n.2 ("To deny injunctive relief in trademark litigation, . . . some affirmative conduct in the nature of an estoppel, or conduct amounting to 'virtual abandonment,' is necessary.") (internal citations omitted); *Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 462 (4th Cir. 1996) ("Although the doctrines of acquiescence and laches, in the context of trademark law, both connote consent by the owner to an infringing use of his mark, acquiescence implies active consent, while laches implies a merely passive consent."); *SCI Sys., Inc. v. Solidstate Controls, Inc.*, 748 F. Supp. 1257, 1262 (S.D. Ohio 1990) (same).

In *University of Pittsburgh v. Champion Prod., Inc.*, 686 F.2d 1040, 1044-45 (3d Cir. 1982), a decision relied upon by this Court in *Tandy*, the Third Circuit recognized that although mere delay by an injured party in bringing suit would not bar injunctive relief, "there is that narrow class of cases where the plaintiff's delay has been so outrageous, unreasonable and inexcusable as to constitute a virtual

abandonment of its right." (citing *Anheuser-Busch, Inc. v. DuBois Brewing Co.*, 175 F.2d 370, 374 (3d Cir. 1949) ("[M]ere delay by the injured party in bringing suit would not bar injunctive relief. This doctrine, however, has its limits; for example, had there been a lapse of a hundred years or more, we think it highly dubious that any court of equity would grant injunctive relief against even a fraudulent infringer.")).

Implicit in a finding of laches or acquiescence is the presumption that an underlying claim for infringement existed at the time at which we begin to measure the plaintiff's delay.[2] In *Brittingham v. Jenkins*, 914 F.2d 447 (4th Cir. 1990), the Fourth Circuit held:

> While the operation of laches depends upon the particular facts and circumstances of each case, the following factors ordinarily should be considered: (1) whether the owner of the mark knew of the infringing use; (2) whether the owner's delay in challenging the infringement of the mark was inexcusable or unreasonable; and (3) whether the infringing user was unduly prejudiced by the owner's delay.

*Id.* at 456. In *Sara Lee*, the Fourth Circuit recognized that a laches analysis "assumes the existence of an infringement for an extended period prior to the commencement of litigation." 81 F.3d at 462 (relying on *Brittingham* and holding that "to the extent that a plaintiff's prior knowledge may give rise to the defense of estoppel by laches, such knowledge must be of a pre-existing, *infringing* use of a mark."). In other words, when a defendant charged with trademark infringement avails itself of an acquiescence defense, we must presume the existence of some underlying infringement to which the plaintiff acquiesced, and any delay attributable to the plaintiff must be measured from the time at which the plaintiff knew

---

[2]In this context, we use the analysis of laches and acquiescence interchangeably given that acquiescence encompasses the elements of laches.

In *Prudential Ins. Co. v. Gibraltar Fin. Corp.*, 694 F.2d 1150, 1154 (9th Cir. 1982), a decision largely relied upon by the *SCI* Court, the plaintiff was a general insurance provider, and the defendant was a savings and loan association with insurance sales comprising less than 0.3 % of its business. *See id.* at 1155. Relying on a number of progressive encroachment cases, the *Prudential* Court stated:

> These cases all rely on the principle that if the junior user of a mark moves into direct competition with the senior user, selling the same "product" through the same channels and causing actual market confusion, laches is no defense. Gibraltar has not moved into direct competition with Prudential as contemplated in these cases. Gibraltar and Prudential do not offer the same services to any substantial extent and there is *no evidence that actual confusion of their services has occurred.*

*Id.* at 1154 (emphasis added) (citing *Chandon Champagne Corp. v. San Marino Wine Corp.*, 335 F.2d 531, 535 (2nd Cir. 1964); *Standard Oil Co. v. Standard Oil Co.*, 252 F.2d 65 (10th Cir. 1958); *Independent Nail & Packing Co. v. Stronghold Screw Products, Inc.*, 205 F.2d 921, 927 (7th Cir. 1953); *Miss Universe, Inc. v. Patricelli*, 271 F. Supp. 104, 110 (D. Conn. 1967)).

*Kason*, *SCI* and *Prudential*, however, do not stand for the proposition that direct competition of identical products in identical markets is required for a finding of progressive encroachment. For example, in *Independent Nail & Packing*, 205 F.2d at 923, the plaintiff was a manufacturer of nails, and registered its "Stronghold Nails" trademark in 1938. Shortly thereafter, the defendant, a manufacturer of screws, nuts, and bolts, began using the name "Stronghold" in the design of a bolt and washer displayed on its business forms and catalogs; also displayed on these items was the company's name, Manufacturers Screw Products. *See id.* at 923-24. The plaintiff was aware of defendant's use of the name "Stronghold" on its business forms as early as 1941. *See id.* at 924, 927. In 1946, the defendant changed its name from

In *SCI Systems*, 748 F. Supp. at 1257, the district court also was faced with a progressive encroachment claim countering a laches defense. There, the plaintiff provided a variety of electrical and electronic goods, including electrical power supplies and engineering services, and the defendant manufactured and sold electrical power control equipment. *See id.* at 1259. The plaintiff admitted that it had been aware of defendant's trademark and product since 1969, but claimed that the defendant had "only recently departed from the business practices which had allowed the parties to co-exist peaceably for many years, and that defendant has only recently encroached on plaintiff's rights." *Id.* at 1262. The plaintiff presented evidence showing that the defendant made certain changes to its mark, making it more similar in appearance to plaintiff's mark. *See id.* at 1262-63.

[I]t was not until the 1980's when defendant entered into the data processing market, of which plaintiff had been a part for many years, by offering uninterruptible power supplies specially designed for use with data processing equipment . . . that *actual confusion between the companies developed*. It was not until this time, plaintiff contends, that the defendant changed its color scheme and its trademark presentation significantly which brought its usage of the mark "SCI" much closer to plaintiff's use.

*Id.* at 1262 (emphasis added).

The *SCI* Court recognized that under a progressive encroachment analysis, changes to a trademark and entry into the same marketing area can defeat a claim of laches. *See id.* at 1262. Because the defendant in *SCI* had "expanded its line and entered into new marketing areas[, and] . . . changed the appearance of its mark through presentation changes in design and color," the *SCI* Court, without addressing the merits of the underlying dispute or whether defendant was within its rights to make such changes, reversed the district court's grant of summary judgment in favor of the defendant on the defense of laches. *Id.* at 1263.

or should have known that this infringement had ripened into a provable claim. *See Kason Indus., Inc. v. Component Hardware Group*, 120 F.3d 1199, 1206 (11th Cir. 1997) ("[D]elay is to be measured from the time at which the plaintiff knows or should know she has a provable claim for infringement."); *Gasser Chair Co. v. Infanti Chair Mfg. Corp.*, 60 F.3d 770, 777 (Fed. Cir. 1995) (holding that the trigger for delay begins when the plaintiff's "right ripens into one entitled to protection") (citation omitted).

Potential plaintiffs in trademark infringement cases steer a hazardous course between the Scylla of laches and acquiescence and the Charybdis of premature litigation. The Fourth Circuit articulated this quandary as follows:

From the time that [defendant] Kayser-Roth first introduced its Leg Looks (R) products, [plaintiff] Sara Lee has been on the horns of a dilemma: If [the trademark owner] waits for substantial injury and evidence of actual confusion, it may be faced with a laches defense. If it rushes immediately into litigation, it may have little or no evidence of actual confusion and real commercial damage, may appear at a psychological disadvantage as "shooting from the hip" and may even face a counterclaim for overly aggressive use of litigation.

*Sara Lee*, 81 F.3d at 462 (internal quotation marks and citation omitted) (third alteration in original). This common predicament has given rise to the doctrine of progressive encroachment.

Progressive encroachment is relevant in assessing whether laches or acquiescence may be used to bar a plaintiff's trademark claim; it applies in cases where the defendant has engaged in some infringing use of its trademark—at least enough of an infringing use so that it may attempt to avail itself of a laches or acquiescence defense—but the plaintiff does not bring suit right away because the nature of defendant's infringement is such that the plaintiff's claim has yet to ripen into one sufficiently colorable to justify litigation.

In *Kason*, the Eleventh Circuit addressed a plaintiff's progressive encroachment claim in the context of a defendant's laches defense, explaining the relationship between the two doctrines as follows:

> Though courts typically discuss encroachment as an excuse for delay, a close examination of . . . cases reveals that the doctrine significantly overlaps the courts' inquiry into when delay begins. In *AmBrit*, for example, this court measured delay from the point where the plaintiff knew the defendant was manufacturing the allegedly infringing product, but we considered the plaintiff's reasonable explanation for failing to sue immediately.

*Kason*, 120 F.3d at 1206 (citing *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1546 (11th Cir. 1986)). The plaintiff in *Kason* was a manufacturer and distributor of commercial refrigeration and food services hardware, and the defendant produced and marketed nearly identical hardware. *See id.* at 1201. Both parties competed in two markets: the original equipment manufacturer's market (OEMs) and the replacement parts distribution markets. *See id.* However, with regard to some particular parts, the plaintiff alleged that the defendant had been competing only in one market and had slowly encroached upon the other market—that is, the market in which plaintiff had been competing. *See id.* at 1201-2. *Kason* held that "where a defendant begins use of a trademark or trade dress in the market, and then directs its marketing or manufacturing efforts such that it is placed more squarely in competition with the plaintiff, the plaintiff's delay is excused." *Id.* at 1205.

Because the doctrines of laches and acquiescence must assume some underlying infringement, we recognize progressive encroachment as simply giving the plaintiff some latitude in the timing of its bringing suit, that is, waiting until the "likelihood of confusion looms large" to bring the action. *Sara Lee*, 81 F.3d at 462 (quoting THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, § 31.06[2][a] (3d ed. 1995), renumbered as § 31.19 (4th ed.

1997)); *see also O. & W. Thum Co. v. Dickinson*, 245 F. 609, 623 (6th Cir. 1917) (recognizing that progressive encroachment is "a course [that] does not tend to arouse hostile action until it is fully developed"). Progressive encroachment is an offensive countermeasure to the affirmative defenses of laches and acquiescence; upon a finding of progressive encroachment, the delay upon which those defenses are premised is excused. In other words, progressive encroachment allows the plaintiff to demonstrate that although it might have been justified in bringing suit earlier but did not, certain factors now exist that have prompted it to do so.

The *Kason* Court, like many courts before it, recognized that implicit in a progressive encroachment analysis is an inquiry into the likelihood of confusion between the parties' marks.

> The district court should have evaluated under the progressive encroachment theory the point at which Kason could have demonstrated likelihood of confusion in its primary (either OEM or replacement) market . . . . It is not clear when Kason determined there was a likelihood of confusion in either market to file a claim for dress infringement. Thus, the district court on remand must view the merits of Kason's claims of trade dress infringement for each product in terms of the market involved. *It must determine whether there is a difference between the two markets material to the infringement claim, and whether and when any likelihood of confusion might have ripened into a claim.* We deem all of these facts not only relevant to the merits of Kason's claims, but also relevant to the equitable doctrine of laches and when, if at all, Kason legally could have asserted a provable claim of trade dress infringement. On the record submitted, without further explication by the district court, we cannot say as a matter of law that laches bars any claim.

*Kason*, 120 F.3d at 1206-07 (emphasis added).