**PRESIDENT AND FELLOWS OF HARVARD COLLEGE,**

v.

**HARVARD BIOSCIENCE, INC.**

No. Civ.A. 00–CV–12625–RGS.

United States District Court,
D. Massachusetts.

May 6, 2002.

Robert M. Asher, Lee Carl Bromberg, Joel R. Leeman, Bromberg & Sunstein, Boston, MA, for plaintiff.

Jill R. Gaulding, Franklin H. Levy, Daniel M. Rabinovitz, Dwyer & Collora, LLP, Boston, MA, for defendant.

## MEMORANDUM AND ORDER ON DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

STEARNS, District Judge.

On December 26, 2000, Harvard University brought this lawsuit against defendant Harvard Bioscience (Bioscience) complaining that the latter's use of the term "Harvard" in various media, either alone or in the tandem combinations "Harvard Bioscience," "Harvard Apparatus," and "Harvard Pump," among others, violated the Lanham Act's prohibitions against trade mark infringement, unfair competition, dilution, and cybersquatting. *See* 15 U.S.C. §§ 1114(1), 1125(a), 1125(c), and 1125(d).[1] On April 6, 2001, the court heard argument on Harvard University's motion for a preliminary injunction enjoining Bioscience from any further use of the "Harvard" mark in sales catalogs and promotional materials. The court allowed the motion in part, and enjoined Bioscience from using the "Harvard" mark, singularly or in combination with other words, in a crimson or red font similar or identical to that used to display Harvard University's logo.[2]

On December 19, 2002, Bioscience moved for partial summary judgment arguing that any objection to its use of the name "Harvard Apparatus" was barred by the equitable doctrines of laches and acquiescence. On May 2, 2002, the court heard oral argument. As Bioscience made clear at the hearing, it seeks judgment only with respect to its use of the "Harvard Apparatus" name. It concedes that whether its use of the name in a crimson font resembling Harvard University's mark constitutes infringement is a matter of factual dispute to be resolved at trial.

The following facts are undisputed (or indisputable). In 1901, William Townsend Porter, an Associate Professor at the Harvard Medical School, established the Harvard Apparatus Company to market medical research equipment manufactured in the Medical School's machine shop. In 1907, Charles Elliot, the President of Harvard University, instructed Porter to move the flourishing business off campus and to terminate its quasi-affiliation with the Medical School. In a 1906 letter communicating President's Elliot's intentions to a Member of the Board of Overseers, Jerome Greene, the Secretary to the Presi-

1. Harvard University also alleges state law claims of unfair competition and a violation of Chapter 93A.

2. In response to a dispute between the parties over the scope of the injunction, the court subsequently made clear that Bioscience was enjoined from using the word "Harvard" in the singular or in conjunction with terms such as "Apparatus" in a crimson or red University-style font, but not from using the unadorned name "Harvard."

dent and to the Harvard Corporation, stated that .

> hereafter the Harvard Apparatus Company is to be treated as a complete outsider. Its apparatus will be bought whenever it is to the financial advantage of the Physiological Laboratory to do so; but its relations with the Laboratory will be like those of any other factory.

Porter moved the company to a barn on his farm in Dover, Massachusetts, where its business and charitable activities continued to expand. Among the many devices that the company marketed under the name of Harvard Apparatus was the "Harvard Pump," an innovative syringe pump widely used in physiological research. Harvard University was a major customer of Harvard Apparatus and over the years, Harvard Medical School and School of Public Health professors served as consultants or members of the company's board. Board meetings were regularly held at the Harvard University Faculty Club.

In 1978 or 1979, Harvard Apparatus was sold to Ealing Corporation, a public company controlled by Paul Grindle. The new owners continued to market medical devices under the name Harvard Apparatus. In 1996, Grindle sold Harvard Apparatus to David Green and others, who in 2000 restyled the company as Harvard Bioscience, while continuing to sell medical research products under the name Harvard Apparatus.[3]

Prior to 1996, Harvard Apparatus's sales catalogs displayed the company name in different fonts and colors (although red was often prominent). In 1996, Bioscience began to use the word "Harvard" in large point type with a crimson font virtually identical to the University's mark. While the word "Apparatus" endured in the promotional materials, it was subordinated to the word "Harvard" and displayed in much smaller gray typeface. The term "Harvard" also began to appear in the singular in the body of Bioscience's catalogs in such phrases as the "Harvard legend continues." In 1997, Bioscience established a website using the name Harvard in large crimson letters. In 2000, Harvard's trademark program director, Enrique Calixto, learned that Harvard Apparatus and Harvard Bioscience were one and the same company. This lawsuit ensued.

■■■ "The equitable doctrine of laches bars assertion of a claim where a party's delay in bringing suit was (1) unreasonable, and (2) resulted in prejudice to the opposing party." *K–Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 911 (1st Cir.1989). Harvard University's one hundred year delay in interposing an objection to the use of the name Harvard Apparatus by a company that it virtually fathered is beyond the rim of anything a court considering a laches defense has found to be even remotely reasonable.[4] In the same vein, to extinguish one hundred years of good will by barring Biosci-

---

**3.** Grindle retained control of the company's research equipment line of products and continued to do business under the name Harvard Medical, Inc.

**4.** *University of Pittsburgh v. Champion Products, Inc.*, 686 F.2d 1040 (3d Cir.1982), on which Harvard University relies, is readily distinguishable. In that case, the Third Circuit suggested that "less egregious delay," while it might bar a plaintiff's claim for an accounting, should not automatically pre-

clude a claim for prospective injunctive relief. It further noted that the district court's findings indicated that the University in that case may have acquiesced in a local infringement of its mark while remaining blithely unaware of the progressively national scope of the defendant's infringing use. It thus concluded that any bar to prospective relief depended not merely on the University's forty year delay in asserting its rights, but on the degree to which that delay prejudiced the defendant. The Court doubted any prejudice to Champi-

ence from any further use of an established and respected name in the medical research equipment field would undeniably cause prejudice. Harvard University does not deny that it has known of the existence of Harvard Apparatus as an independently operating business using the Harvard name from the very day it was banished from the University's campus.[5] However, it contends that the use of the "Harvard" name only became flagrant in 1996, when Bioscience began to mimic the color and font of Harvard University's distinctive logo.[6] This may be true, but it misses the mark. Bioscience does not challenge the University's right to object to its alleged parroting of Harvard University's distinctive logo. The motion instead seeks simply to preserve Bioscience's right to continue to use the name "Harvard Apparatus" in its promotional campaigns. The "Harvard Apparatus" name has been used continually by the company's owners since it was founded in 1901. What changed in 1996 was Bioscience's perceived attempt to promote confusion between itself and Harvard University by appropriating the University's distinctive presentation of its mark. This is actionable. The use of the unadorned name "Harvard Apparatus," however, is a gift of time.[7]

## ORDER

For the foregoing reasons, the defendant's motion for partial summary judgment is *ALLOWED.*

SO ORDERED.

---

on as its University of Pittsburgh soft goods line was only one of 10,000 that it marketed and, moreover, the success of the line was a function of the prowess of the University's football team rather than the association of the Champion name with the infringing University logo goods. The difference with the case here is that the University of Pittsburgh and Champion, at least in the Pittsburgh area, were in direct competition for sales of University logo items. And unlike the University of Pittsburgh, Harvard University cannot claim that it did not, or should not, have known of the magnitude of Harvard Apparatus's business, given the many associations of its own faculty with the company and (after 1979) the company's public character. Finally, prejudice here lies in the fact that had the purchasers of Harvard Apparatus been apprized of the fact that Harvard University laid claim to the company's name, it is inconceivable that they would have proceeded with the acquisition.

5. It will be remembered that President Elliot raised no objection to Porter's use of the "Harvard Apparatus" name. He simply wanted Porter to take the business off campus for fear that the company's quasi-mercantile status violated the University's charter.

6. Harvard University argues that Bioscience's "progressive encroachment" on its mark, commencing in 1996, defeats the laches defense. This is a mistaken application of the doctrine. "Progressive encroachment" occurs when a junior user of a mark enters the same market area in direct competition with the mark's senior user. *Kellogg Co. v. Exxon Corp.*, 209 F.3d 562, 573 (6th Cir.2000). There is no plausible argument that Harvard University competes with Biosciences in the sale of medical research equipment or that Biosciences competes with Harvard in supplying educational services. Nor is there any evidence that Bioscience's acquisition of Harvard Apparatus presaged any intent on Bioscience's part to do so, thus triggering an encroachment in the *Kellogg* sense.

7. Harvard University argues in the alternative that Harvard Apparatus operated under an implied license by virtue of its retention of control over the company's operations. *See United States Jaycees v. Philadelphia Jaycees*, 639 F.2d 134, 140 (3d Cir.1981). The University has not, however, plead a license theory in its Complaint and would be hard pressed to do so given the terms under which President Elliot sent Porter and Harvard Apparatus into exile.