**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**DEC 15 2000**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**
**TENTH CIRCUIT**

---

CREATIVE GIFTS, INC.,
FASCINATIONS TOYS & GIFTS,
INC. and WILLIAM HONES,

      Plaintiffs-Appellees,

v.

UFO, MICHAEL SHERLOCK and
KAREN SHERLOCK,

      Defendants-Appellants.

No. 99-2247

---

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. CV-97-1266-LH/WWD)**

---

Paul Adams (Brian J. Pangrle, with him on the briefs) of Peacock Myers &
Adams, P.C., Albuquerque, New Mexico, for Defendants-Appellants.

George C. Meyers, Jr., of Blank Rome Comisky & McCauley LLP, Washington,
D.C. (Denise C. Lane and Lisa Kaufman (Blank Rome), Dewitt M. Morgan and
Edward Ricco of Rodey Dickason Sloan Akin & Robb, P.A., Albuquerque, New
Mexico, with him on the brief) for Plaintiffs-Appellees.

---

Before **KELLY** and **HENRY**, Circuit Judges, and **SHADUR**, District Judge.[*]

---

[*]      The Honorable Milton I. Shadur, Senior United States District Judge
for the Northern District of Illinois, sitting by designation.

**SHADUR**, District Judge.

---

Creative Gifts, Inc. ("Creative Gifts"), Fascinations Toys & Gifts, Inc. ("Fascinations") and William Hones ("Hones") brought a trademark infringement action against Michael and Karen Sherlock and their company UFO, charging the unauthorized use of Creative Gifts' trademark "Levitron."[1]  Sherlocks raised four defenses against the infringement action, including the contention that the term "Levitron" was generic and was therefore unenforceable as a trademark. Sherlocks also advanced no fewer than 23 counterclaims.

After a bench trial the district court rejected all of Sherlocks' defenses and found they had indeed infringed the Levitron trademark.  Accordingly he granted injunctive relief against Sherlocks' future use of the mark.  There was no need at that point to address Sherlocks' counterclaims, because the court had previously dismissed all 23 with prejudice as a Fed. R. Civ. P. ("Rule") 37 sanction for numerous discovery violations committed by Sherlocks.  On this appeal,

---

[1]  UFO is referred to in the pleadings as "a 'trust organization' under the common law" (whatever that may mean), with the two Sherlocks identified as its "managing directors."  Because UFO's precise status makes no difference, either jurisdictionally or otherwise, for convenience all three defendants (appellants here) will be referred to collectively as "Sherlocks," while all three plaintiffs (appellees here) will be referred to collectively as simply "Creative."

Sherlocks challenge both the district court's rejection of their infringement defenses and its dismissal of their counterclaims. We have jurisdiction under 28 U.S.C. §1291, and we AFFIRM the district court's rulings in all respects.

Background

Creative Gifts licenses trademarks and other intellectual property to which it has rights. Fascinations is a four person firm that manufactures and engages in the worldwide sale of science-oriented products and toys to retailers. Hones is vice president of Creative Gifts and president of Fascinations.

In early 1994 Hones and his father Edward developed and patented a magnetically-levitated top or "anti-gravity top" for Creative Gifts. Anti-gravity tops are novelty items comprising a magnetic top and a flat base magnet, with the top capable of floating for several minutes over the magnet. In January 1994 Hones adopted Levitron for use as a trademark for the anti-gravity top. Three months later (on April 4, 1994) Hones personally prepared and filed a word-design trademark application in the Patent and Trademark Office ("PTO"). In the application Hones represented that the Levitron trademark would be used in connection with a "Magnetic Floating Top with Associated Base." On May 30, 1995 the PTO granted the application under Registration No. 1,896,265. Fascinations marketed and sold its first commercial version of the Levitron anti-gravity top using that word-design format from June 1994 to May 1995.

3

In May 1995 Fascinations began selling a new mass-produced version of the anti-gravity top. Fascinations sold the new line of tops using a plain block-letter "LEVITRON" with the trademark symbol "®" and the term "anti-gravity top," rather than the word-design format that had been used for the earlier tops. Since May 1995 Fascinations has used that block-letter format on all of its Levitron anti-gravity tops and all related products.

In the five year period between June 1994 and 1999 Fascinations has sold approximately 500,000 Levitron anti-gravity tops worldwide, and Creative Gifts' Japanese licensee sold another 250,000 in Japan. Fascinations sells its Levitron products to a variety of purchasers, such as national retail companies (like the Nature Company), television retailers and internet retailers. Fascinations' larger accounts include QVC (a national television retailer that reaches 25 million viewers) and national catalogue distributors Hammacher Schlemmer, Sky Mall and the Smithsonian. At all times relevant to this litigation, Fascinations was the sole producer of anti-gravity tops in the United States.

Creative's relationship with Sherlocks began in December 1995 when Michael and Karen Sherlock got in touch with Fascinations to express interest in selling Fascinations' anti-gravity tops. That month Sherlocks made an initial purchase of approximately 300 anti-gravity tops, which they sold or gave away. After that initial order Fascinations and Sherlocks developed an informal business

4

relationship that lasted until August 1997. During that time Sherlocks sold approximately 12,000 Levitron anti-gravity tops.

Although Sherlocks never entered into a formal distributorship agreement with Fascinations, they undertook several initiatives to market Levitron anti-gravity tops. Those efforts, taken with Creative's knowledge and approval, involved active promotion of the product:

1. In January 1996 Sherlocks created and sold a videotape entitled "Secrets of the Levitron: The Art of Levitation."

2. Between July 1996 and August 1997 Sherlocks spent approximately $140,000 for advertising on the Art Bell Show, a radio program.

3. In February 1997 Sherlocks began selling Fascinations' Levitron anti-gravity tops and related products through a website that contained the domain name "levitron.com."

It was that third initiative that led to this lawsuit. When Sherlocks decided they wanted to advertise Fascinations' Levitron anti-gravity tops on the Internet, they requested Fascinations' permission to use Fascinations' Levitron trademark and register it as the domain name[2] levitron.com. That request resulted in an oral

---

[2] Although this explanation may be unnecessary these days, "domain name" is the address for a website, a location on the Internet at which one or more persons can post information that other Internet users may access by typing in the domain name.

agreement that Sherlocks could do so for the sale of Fascinations' tops and related products. No definite duration was agreed on for that permissive use. In October 1996 Sherlocks registered levitron.com as a domain name with Network Solutions, Inc. ("NSI") for $100. Sherlocks then designed a website and eventually began offering Fascinations' Levitron anti-gravity tops and related products for sale in February 1997.

After Sherlocks began using the website, Fascinations attempted to memorialize the parties' oral agreement as to the levitron.com domain name. On June 13, 1997 Fascinations' manager of sales and marketing Gary Armstrong ("Armstrong") sent a draft Internet website license agreement to Sherlocks. Three days later Sherlocks responded via fax, advising Armstrong that they did not believe they needed a license to use the Levitron trademark for the levitron.com website. Armstrong replied later that day, explaining the concern of Fascinations' attorney Saul Leitner as to Sherlocks' use of the Levitron trademark without a written license.

On June 20, 1997 Sherlocks sent Armstrong their counterproposal for a trademark license for the levitron.com website. Fascinations found the proposed license unacceptable because it did not accord with Fascinations' understanding of the oral agreement and because Hones believed it would invalidate the Levitron trademark.

Meanwhile Creative was in the midst of amending the trademark registration from a word-design mark to a word-only mark. According to Hones' testimony at trial, the reason for the amendment was to bring the registration into conformity with the block letter format that Fascinations had used continuously on the product since May 1995, something that attorney Leitner had suggested in 1996. On June 20, 1997 Hones completed the application to have the Levitron trademark amended. That application, filed with the PTO on July 1, 1997, was accepted and Registration No. 1, 896, 265 as amended was issued with an effective registration of May 30, 1995 and is currently in full force and effect.

On June 30, 1997 the parties met in Seattle, where Sherlocks made accusations challenging Hones' status as the inventor of the Levitron anti-gravity top and berated him as a thief and a liar. At that point Sherlocks still owed Fascinations more than $10,000. Between June 30 and mid-August 1997 the relationship between Fascinations and Sherlocks deteriorated rapidly. During that period Sherlocks continued to attack Hones personally in correspondence to him and others, and they notified Fascinations they were withholding payment of the $10,000 debt. On August 19, 1997 Hones advised Sherlocks that he was instituting collection proceedings against them. On August 24, 1997 Sherlocks published the initial "Hidden History of the Levitron" article on the levitron.com website. In the article Sherlocks attacked Hones and his father personally and

7

announced that Sherlocks were suspending sales of Fascinations' Levitron products.[3]

On August 28, 1997 Creative's attorneys sent a letter to Sherlocks advising them that continued use of the levitron.com domain name violated the trademark rights of Creative Gifts and requesting their voluntary transfer of levitron.com to Creative Gifts. That letter also withdrew Sherlocks' permission to use the Levitron trademark and the levitron.com domain name. On the same day Fascinations' collection attorney wrote Sherlocks demanding payment of the $10,000. Sherlocks refused to transfer the domain name, made known their intent to continue using the Levitron trademark without permission and reiterated their refusal to pay their $10,000 debt. Creative filed this trademark infringement suit one month later.

After bringing suit Creative sought to discover information relating to Sherlocks' efforts to market a competing anti-gravity top, information directly relevant to Creative's trademark infringement claim. From the outset Sherlocks, who were proceeding pro se at the time, acted in an extremely disruptive and uncooperative manner, behavior that necessitated substantial involvement by a magistrate judge. Here are some examples:

---

[3] That "Hidden History" article was the basis of Hones' defamation count in the complaint. By a later amendment that count, together with five other counts and all claims for damages, were dropped from the complaint because Sherlocks were effectively judgment-proof.

1. On March 16, 1998 the magistrate judge ordered that all depositions were to take place in a conference room in the district court. That ruling was necessary because Sherlocks had taken the initial position that they would submit to depositions only at their home in the remote community of Kingston, New Mexico, and had also insisted that Edward and William Hones be required to travel to Kingston to give their depositions.

2. On April 28, 1998 Sherlocks refused to appear for their scheduled deposition, forcing an emergency motion and order compelling their appearance.

3. On June 6, 1998 the magistrate judge ordered Karen Sherlock to answer "fully and to the best of her ability" several specific questions she had refused to answer regarding Sherlocks' attempt to market an anti-gravity top. Karen Sherlock had refused to answer those questions despite the court's issuance of a protective order covering the information.

4. On June 8, 1998, in the first of several refusals to cooperate that day, Karen Sherlock notified Fascinations that she would not provide oral testimony, but would respond only in writing to the questions she had been instructed to answer. Throughout her deposition Karen Sherlock continuously refused to answer entirely permissible questions, requiring the

magistrate judge's intervention on several occasions.

5. On June 10, 1998 Karen Sherlock continued to refuse to answer Fascinations' questions despite her understanding that the magistrate judge had said that a potential sanction for such continued refusal would be a contempt finding. Fascinations was required to file a Motion To Compel and, at about the same time, to move for an order compelling Sherlocks to respond to its requests for production of documents.

As stated later in this opinion, as a sanction for Sherlocks' numerous discovery violations the magistrate judge recommended striking their counterclaims as a Rule 37 sanction. After the denial of a motion for reconsideration that they filed on their own, Sherlocks obtained counsel. Their counsel then filed objections to the magistrate judge's report and recommendation striking Sherlocks' counterclaims. After reviewing the magistrate judge's recommendation de novo, the district court upheld the dismissal of Sherlocks' counterclaims.

## Levitron: a Generic Term?

We first address the question whether the district court erred when it found that the term Levitron had not become generic, so that it was enforceable as a trademark. Because determinations of genericness depend upon facts, we must accept the district court's findings unless clearly erroneous (Magic Wand, Inc. v.

RDB, Inc.,940 F.2d 638, 639 (Fed. Cir. 1991)).  As for the legal issue, Sherlocks advance a dual challenge to the district court's ruling.  First, they contend that the district court erred by assigning them the burden of proving that the Levitron trademark had become generic.  Second, they argue that regardless of the placement of the burden of proof, the evidence before the court compelled a finding that the term Levitron was generic.  Both arguments fail.

When the relevant public ceases to identify a trademark with a particular source of a product or service but instead identifies the mark with a class of products or services regardless of source, that mark has become generic and is lost as an enforceable trademark  (Glover v. Ampak, Inc., 74 F.3d 57, 59 (4th Cir. 1996), citing 15 U.S.C. §1064(3)).  For that purpose determinations of genericness are resolved under the statutory "primary significance" test (15 U.S.C. §1064(3)), and the "relevant public" are the actual or potential purchasers of the particular goods or services in the marketplace (Magic Wand, 940 F.2d at 640).   Prominent examples of once valid trademarks that became generic through popular use are the words "escalator" and "thermos" (Beer Nuts, Inc. v. Clover Club Foods Co., 711 F.2d 934, 939 (10th Cir. 1983)).

As for Sherlocks' burden of proof contention, Glover, 74 F.3d at 59 exemplifies the universal caselaw pronouncements:

> Because a trademark's certificate of registration carries with it the presumption that the trademark is valid, see 15 U.S.C. §1057(b), a

11

party seeking cancellation of a registration on the ground that the mark has become generic carries the burden of proving that fact by a preponderance of the evidence.

Evidence of the public's understanding may come from direct testimony of purchasers, consumer surveys, dictionary listings, newspapers and other publications (id., citing Magic Wand, 940 F.2d at 641). As Glover, id. went on to say, it is only by showing that the public understands the mark to signify the class of goods or services of which the trademarked product or service is a part that the party who seeks to cancel a registration is able to carry its burden.

Faced with that statutory and caselaw placement of the burden of proof on their shoulders, Sherlocks seek to escape by arguing that the district court nonetheless misallocated that burden because the June 1997 trademark amendment was invalidly procured. We reject that latter contention below, so that the dependent burden-of-proof argument falls of its own weight. But even beyond that, because the argument was not made below and is raised for the first time on this appeal, we need not consider it at all. Issues not raised in the district court are considered on appeal only under exceptional circumstances or to prevent manifest injustice (Doelle v. Mountain States Tel. & Tel., 872 F.2d 942, 944 n.4 (10th Cir. 1989)(per curiam)). No such exception is warranted here.

Nor does Sherlocks' second argument succeed. Contrary to their assertion, the evidence presented to the district court did not constitute "overwhelming

12

proof" that the term Levitron is generic. In an effort to support their position, Sherlocks have primarily identified two classes of evidence that they produced at trial:

> 1. handwritten customer orders they received while selling Fascinations' anti-gravity tops and
>
> 2. a selective compilation of Internet websites that (they say) arguably reflect generic use of the term Levitron.

Neither type of evidence, either individually or collectively, renders the district court's findings on the issue clearly erroneous.

In that first category of evidence, Sherlocks introduced a set of 931 handwritten purchase orders that they had compiled from customers that spoke only of "Levitron," from which Sherlocks seek to infer that those customers used the term levitron as a generic noun and not in an adjectival sense as an identification of source. Such attempted reliance on the purchase orders as a basis for reversing the district court's findings on this issue is misplaced for at least two reasons.

For one thing, we have already said that Sherlocks' position assumes that when that group of customers used the term Levitron alone, the significance those customers attached to the term was primarily as the identifier of a product and not an identifier of source. But that assumption glosses over--or more accurately,

13

ignores entirely--the facts that Fascinations was the sole supplier of anti-gravity tops at the time of this lawsuit and that those tops were advertised in the Levitron name and marketed in Levitron packaging. There is a meaningful distinction between a situation in which there are a number of competing products on the market and a trademark owner may have failed to take sufficient care to prevent its name from passing into the public domain--as when some members of an earlier generation were wont to use the word "Frigidaire" as synonymous with any refrigerator--and one in which a product has only one producer. In the latter case it is really impossible to discern whether a lay consumer placing an order by the use of the name Levitron alone primarily signifies the product rather than its source.

Although Sherlocks have recognized that difficulty, they still claim the district court erred because, in their words, "How the court could divine whether the purchaser was identifying the product or source is left unanswered." But that is precisely the point: Because product and source merged entirely under the circumstances here, the district court properly found that the group of orders did not establish that the term Levitron had become generic.

Sherlocks' attempted reliance on that batch of customer orders is misplaced for a second reason. Even if the district court had adopted the skewed premise that the 931 consumer orders produced at trial were somehow probative of generic

use by the persons placing the orders, they constitute only a negligible--and impermissibly selective--portion of the customers who purchased anti-gravity tops.  Fascinations sold approximately 500,000 tops during the five year period from 1994 to 1999, so that the purchase orders provided by Sherlocks constituted less than 0.2% of Fascinations' anti-gravity tops sold during that period.  And of at least equal importance, most of the Sherlocks-selected purchases were made by individuals who had heard only advertisements on the Art Bell radio show.  Unlike such actual and potential purchasers (the latter category numbering millions) as QVC viewers, catalog readers and Nature Store shoppers, the radio-listening purchasers did not see Levitron anti-gravity top packaging, which set out the trademark in proper form.  Thus the tiny percentage of customer orders proffered by Sherlocks were not at all representative of the relevant public.

Sherlocks' second category of evidence--a selective compilation of Internet website pages that, they say, contain examples of the generic use of the term levitron--also fails as a basis for overturning the district court's findings.  Even if we assume that the appendix provided to us is representative of the trial exhibit (a showing that Sherlocks have not made[4]), we regard the exhibit as having little, if any, probative value.

---

[4]    At trial Sherlocks produced a 325 page exhibit of various website pages that they claimed reflect generic use of the term Levitron.  On appeal Sherlocks have tendered only 35 pages of that exhibit.

For one thing, even a cursory glance at the exhibit reveals that some of the websites surely use the term Levitron as an adjective, while others are written in foreign languages with no translation available. Moreover, the exhibit has no assurance of representativeness (and hence of evidentiary reliability)--it was compiled by Karen Sherlock in an admittedly biased manner in which she searched only for those websites that appeared to use the term Levitron generically. And none of the websites produced in the appellate appendix came from traditionally competent sources such as newspapers or trade journals.

In sum, there is no basis for questioning the district court's decision based on either of the two categories of evidence identified by Sherlocks.[5] That aspect of their appeal fails.

<u>Procurement of the Amended Registration</u>

We turn to Sherlocks' contention that the 1997 amendment to the trademark registration was fraudulently obtained. Sherlocks assert (1) that the trademark was amended from a "word-design" trademark to a "word-only" trademark in an effort to expropriate the internet domain name levitron.com and (2) that there was

---

[5] It is worth remarking all of the customarily-offered types of evidence as to claimed genericness that Sherlocks did <u>not</u> produce. They elicited no consumer testimony or consumer surveys. Nor did they, on the basis of the record before us, proffer any listings in dictionaries, trade journals or newspapers. At least with respect to dictionary listings, the word Levitron is not listed in the comprehensive unabridged Webster's <u>Third New International Dictionary</u> (1986), and there is no suggestion that the word appears in any other lexicographic compendium of more recent vintage.

16

a duty to inform the PTO of that alleged motive when the amendment was sought. But we need not address the merits of those assertions, because even on the highly dubious premise that Sherlocks could establish any such motivation (for the record evidence does not support it), that fact would carry no substantive weight.

Sherlocks have identified two theories for the purported significance of their fraudulent registration claim. First, they argue that the district court's failure to find that the registration was improperly amended led it to misallocate the burden of proof on the genericness issue. Second, they contend that the same asserted failure undermined the district court's final judgment, on the premise that the sole basis of its decision to require Sherlocks to transfer the domain name levitron.com was to comply with NSI policy (applicable only if the mark was validly amended). Neither assertion succeeds.

As for Sherlocks' burden of proof claim on the genericness issue, we have already held that Sherlocks cannot present that argument here for the first time, not having raised it before the district court. And as to Sherlocks' second argument, they have simply misrepresented the nature of the district court's final judgment. Contrary to Sherlocks' characterization, the district court's order transferring use of the levitron.com domain name to Creative was in no way dependent on the latter's compliance with NSI policy. Because the manner in which Creative obtained its trademark registration is thus irrelevant to this case,

Sherlocks' contention on that score is equally irrelevant.[6]

### Sherlocks' Newly Raised "Acquiescence" Defense

Before the district court Sherlocks raised a novel defense theory that they characterized as an "implied license based on promissory estoppel."[7] In the jointly tendered pretrial order entered by the district court, Sherlocks identified this as the question posed by that theory:

> Whether the promises made by Plaintiffs to Defendants (carried out verbally and by conduct) with respect to use of the word "levitron" should have been reasonably expected to induce action or forbearance on the part of Defendants and whether Defendants detrimentally relied on such promise as supporting an indefinite implied license to use the word "levitron."

It appears that the district court assumed that promissory estoppel could render an otherwise at-will trademark license irrevocable. Nonetheless the district court rejected the defense on the ground that Sherlocks' expenditures on advertising costs did not constitute "detrimental reliance as that term is used in a promissory estoppel context," because they had realized a gross income of approximately $420,000 as a result of those advertising expenditures.

On appeal Sherlocks have shifted gears from their earlier promissory

---

[6]    Though we have dispatched this contention on technical grounds, we should make it plain that nothing before us suggests that the argument has any validity in terms of its merits either.

[7]    Our own research has revealed no prior federal cases in which such a theory had been proposed.

estoppel theory, arguing instead that their license became irrevocable under an "acquiescence" defense. They attribute their shift in theories to a "muddle in the case law relating to estoppel, laches, acquiescence, and implied license."

We reject that new-fashioned "acquiescence" argument because Sherlocks never raised it below. Acquiescence is an affirmative defense that requires a "finding of conduct on the plaintiff's part that amounted to an assurance to the defendant, express or implied, that plaintiff would not assert his trademark rights against the defendant" (Kellogg Co v. Exxon Corp., 209 F.3d 562, 569 (6th Cir. 2000), quoting language originating in Sweetheart Plastics, Inc. v. Detroit Forming, Inc., 743 F.2d 1039, 1046 (4th Cir. 1984)). Acquiescence requires proof even more demanding than a showing (which would suffice for a laches defense) that the party seeking to enforce its trademark rights has unreasonably delayed pursuing litigation and, as a result, has materially prejudiced the alleged infringer (Kellogg, id.).

By contrast, the promissory estoppel theory Sherlocks raised before the district court did not assert that Creative had delayed unreasonably in pursuing litigation and that Sherlocks had suffered resulting prejudice. Because Sherlocks' new theory is materially different, it cannot be advanced here in the first instance (though it would fail on the merits anyway). And their promissory estoppel argument fares no better here than it did in the district court.

19

## "Naked Licensing" as a Defense

Sherlocks' fourth and final rejected defense before the district court was that Creative's grant of authority for their use of the Levitron trademark had been a naked license:  permission to use the mark without attendant provisions to protect the quality of the goods bearing the licensed mark.  Because naked licensing if established is treated as an abandonment of the trademark, which triggers the loss of trademark rights against the world, anyone attempting to show such abandonment via naked licensing faces a stringent burden of proof (Moore Business Forms, Inc. v. Ryu, 960 F.2d 486,489  (5th Cir. 1992), citing Taco Cabana Int'l, Inc. v. Two Pesos, Inc., 932 F.2d 1113, 1121 (5th Cir. 1991), later aff'd 505 U.S. 763 (1992)).

Here Sherlocks' status as licensees estops them from making that naked licensing argument in any event.  Although the licensee estoppel rule in patent cases was struck down in Lear v. Adkins, 395 U.S. 653 (1969), with only a few exceptions the caselaw since then has held the Lear non-estoppel rule inapplicable in the trademark context.  3 Rudolf Callmann, Unfair Competition, Trademark & Monopolies §19.48, at 434 (Louis Altman 4th ed. 1998 and 2000 cum. supp.) (footnotes and citations omitted, emphasis added) summarizes in relevant part the established law of licensee estoppel in trademark cases:

> The licensee is estopped from claiming any rights against the licensor which are inconsistent with the terms of the license.  This is true

20

even after the license expires. He is estopped from contesting the validity of the mark,...or challenging the license agreement as void or against public policy, e.g., because it granted a naked license. But he may challenge the licensor's title to the mark based on events which occurred <u>after</u> the license expired.

Accord, J. Thomas McCarthy, <u>Trademarks & Unfair Competition</u> §18:63 (4th ed. 2000).

Throughout the time that Sherlocks purchased and sold Creative's products under the Levitron trademark, they were licensed to use the mark--a license that was terminated by Creative on August 28, 1997. And all of the conduct on which Sherlocks predicate their naked license argument--specifically activities related to the "Secrets of the Levitron" videotape and the levitron.com website--is based on Creative's alleged failure to police or control Sherlocks' use of the Levitron trademark during the life of the license. Hence Sherlocks are estopped from arguing naked licensing, and their argument fails.[8]

<u>Dismissal of Sherlocks' Counterclaims</u>

One issue remains: whether the district court abused its discretion when it dismissed Sherlocks' 23 counterclaims as a Rule 37 sanction. Although they admit that their behavior was unacceptable during discovery (really an understatement), Sherlocks contend that dismissal was an unduly harsh sanction because they were proceeding pro se at the time of those violations.

---

[8] We therefore need not consider whether, under the circumstances of this case, any naked license contention would have had any force to begin with.

21

We would be entirely justified in deep-sixing that last contention simply because of the manner in which Sherlocks have posed (or have not posed) it on appeal. Their opening brief included less than a page of argument, containing no discussion of the standard of review, no citations to the record and no discussion of relevant authority, and failing to articulate clearly any basis upon which the dismissal should be overturned. In violation of 10th Cir. R. 28.2, they failed to include any of the orders issued by the magistrate judge or the district judge relevant to the dismissal of their counterclaims. Their statement of facts contains not a single reference to the district court's dismissal of their counterclaims, let alone any account of their discovery violations. And it could be viewed as a fatal flaw that their issues-presented section does not even specify the dismissal of their counterclaims as one of the issues for review.

Those multiple deficiencies placed an unfair burden on Creative by compelling a topsy-turvy presentation in which Creative as appellees had to provide the relevant excerpts from the record and relevant authorities, thus depriving Creative of the opportunity to respond to arguments that were then newly raised by Sherlocks in their reply brief. Though Sherlocks thus deserve even shorter shrift than we give them in the following paragraphs, we will spend a few moments in demonstrating the lack of merit in their position.

Rule 37(b)(2)(C) permits courts to strike pleadings or dismiss an action

where a party fails to obey an order to provide or to permit discovery (Ehrenhaus v. Reynolds, 965 F.2d 916, 920 (10th Cir. 1992)). By definition the district court is best equipped to make any necessary fact-specific inquiries, so that such sanctions are overturned only for an abuse of discretion (id.).

Here the district court, in adopting the magistrate judge's recommendation to strike Sherlocks' counterclaims, explicitly considered each of the five factors identified in Ehrenhaus, id. at 921 (citing numerous cases). And though courts naturally go more slowly in using dismissal as a sanction in the case of pro se litigants (Ehrenhaus, id. at 920 n. 3), such litigants have no license to flout a court's authority wilfully. Although pro se litigants get the benefit of more generous treatment in some respects, they must nonetheless follow the same rules of procedure that govern other litigants (Oklahoma Federated Gold & Numismatics, Inc. v. Blodgett, 24 F.3d 136, 139 (10th Cir. 1994)). And here the record exhibits numerous and flagrant discovery violations, too numerous to catalog here. Sherlocks' last argument fails utterly.[9]

### Conclusion

We AFFIRM the order of the district court finding Creative entitled to

---

[9] As to Sherlocks' other contention (raised for the first time in their reply brief) that the dismissal sanction exceeded the district court's authority because Sherlocks' discovery violations were not "related" to their counterclaims, they have shot themselves in the foot by failing to provide the record necessary for its evaluation.

injunctive relief against Sherlocks' use of the Levitron trademark. We also

AFFIRM the district court's order dismissing Sherlocks' counterclaims.