# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

February 23, 2015

Lyle W. Cayce
Clerk

No. 13-20558

PENNZOIL-QUAKER STATE COMPANY

Plaintiff - Appellant

v.

MILLER OIL AND GAS OPERATIONS; WILLIAM J. MILLER; MILLER OIL & GAS OPERATIONS, LIMITED; METRON MANAGEMENT COMPANY, L.L.C.; WILLIAM CYLVESTOR WILLIAMS, JR.; BILL LINCOLN,

Defendants - Appellees

Appeal from the United States District Court
for the Southern District of Texas

Before JOLLY, HIGGINBOTHAM, and OWEN, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

The holder of a trademark has certain rights, among them the power to prohibit another entity from using its mark without its consent. Those rights are subject to equitable defenses, including acquiescence, where the markholder affirmatively represents to another that it may use its mark, who then relies on that representation to its prejudice. This case requires us to clarify the role that undue prejudice plays in the analysis of acquiescence. Concluding that the defendant here failed to demonstrate that it was unduly prejudiced by any representations made by the markholder, we reverse.

No. 13-20558

I.

This is a dispute about a commercial relationship, one largely defined by the use of another's intellectual property, gone bad. Pennzoil-Quaker State Company ("Pennzoil"), makes and sells automotive lubricants, including motor oil. As part of its business, Pennzoil owns several federally recognized trademarks and trade dress,[1] notably the name "Pennzoil," the "Pennzoil Across the Bell" logo, and a color scheme involving the use of yellow with black accents. Pit Stop U.S.A. ("Pit Stop") is a quick-stop oil change and state inspection facility located in Houston. It is owned and operated by Miller Oil and Gas Operations ("Miller Oil").[2]

A.

The relationship between the parties began in November 1997, when Pennzoil and Miller Oil entered into a five-year agreement (the "1997 Agreement"). Pennzoil agreed to loan Miller Oil equipment for use at Pit Stop, including storage tanks, delivery hoses, pumps, and an external Pennzoil sign. Pennzoil also provided Miller Oil with six plastic panel inserts, bearing Pennzoil marks, to be placed in Pit Stop's pre-existing outdoor pylon sign pole. In exchange, Miller Oil agreed that at least 85% of its monthly motor oil and fluid purchases would be from Pennzoil. The agreement expired in mid-2003.

Pennzoil did not request that Miller Oil return the equipment. Rather, in August 2003, Pennzoil and Miller Oil negotiated a second, three-year

---

[1] "'Trade dress' refers to the design or packaging of a product which serves to identify the product's source." *Eppendorf-Netheler-Hinz GMBH* v. *Ritter GMBH*, 289 F.3d 351, 354-55 (5th Cir. 2002) (quoting *TrafFix Devices, Inc.* v. *Mktg. Displays, Inc.*, 532 U.S. 23, 28 (2001)).

[2] The other defendants-appellees include: William C. Williams, Jr., the managing general partner of Miller Oil; Metron Management Company, L.L.C., the general partner of Metron Oil & Gas Operations, which supplies automotive parts and oil to Pit Stop; and Bill Lincoln, the now-deceased former manager of Pit Stop.

Unless otherwise noted, we refer to all defendants collectively as "Miller Oil."

agreement (the "2003 Agreement"). Pennzoil granted Pit Stop a "non-exclusive license during the term of th[e] agreement to use and display" the Pennzoil marks. In return, Miller Oil agreed that it would not blend any Pennzoil products with non-Pennzoil products, or represent a non-Pennzoil liquid as one produced by Pennzoil.

Next, in 2004, Pennzoil and Miller Oil began discussions about a "re-imaging" of Pit Stop, whereby the facility would be painted and re-designed to emphasize Pennzoil's trademarks and trade dress. These conversations went nowhere,[3] and the 2003 Agreement expired by its own terms in March 2006, with no renewal.[4]

Three years later, Pennzoil made a new proposal, whereby Pit Stop would be a "prototype site" for Pennzoil's broader corporate re-imaging efforts. Miller Oil agreed, though it was not required to sign a contract before re-imaging started.[5] It did, however, report a "general understanding" that Pit Stop had a "continuing dut[y]" to sell Pennzoil products as a condition of keeping its Pennzoil signage and dress. The re-imaging itself was substantial and took four to six weeks, though Pit Stop only had to close for one weekend. In sum, as found by the district court, Pennzoil paid for:

1. The installation of a new 48-square-foot freestanding pylon sign and readerboard that replaced the Pennzoil pole sign provided under the 1997 Agreement.

---

[3] The sticking point appeared to be whether Miller Oil would be willing to enter into any new Pennzoil minimum purchase contracts. Miller Oil, apparently wanting to start selling generic motor oil, was unwilling to sign such agreements.

[4] Two months later, in May 2006, Pennzoil contacted Miller Oil and requested that they mutually cancel the 2003 Agreement and enter into a new Sales Agreement. It is unclear from the record why Pennzoil wanted Miller Oil to cancel an agreement that had already expired. In any event, Miller Oil signed the cancellation, but did not enter into a new agreement.

[5] During trial, in response to the question, "[b]efore you did the redesign, were you required to sign an agreement to get the redesign," the general manager of Pit Stop answered, "no."

3

No. 13-20558

2. The removal (or permanent over-paint as applicable) of existing Pit Stop logo signage and its red, white, blue, and yellow trade dress, which covered the building.

3. The installation of four new steel-framed lit Pennzoil signs – one for each exterior wall of the building.

4. The installation of a steel-framed "awning" that encircles the building and is covered with the Pennzoil Trade Dress. The "10 Minute Oil Change" mark and the words "Pit Stop USA" are painted directly on the front and back of the awning.

5. The installation of a three-dimensional painted metal accent (the "mid stripe") that encircles the middle of the building and is yellow and black to match the awning – Pennzoil's Trade Dress.

6. The alteration of an existing ground-mounted Pennzoil sign located in the front of the building, which was changed to a state inspection sign.

Apparently on its own initiative, and using its own funds, Miller Oil repainted the inside of the Pit Stop station so it matched the exterior.

Pennzoil and Pit Stop's relationship was quiet for the next four years. That ended in 2010 when, after receiving an inquiry from a third party, Pennzoil investigated whether the bulk oil that Pit Stop claimed was a Pennzoil product was actually produced by Pennzoil. After a laboratory investigation, it concluded that the oil was, in fact, mislabeled. Accordingly, Pennzoil sent Miller Oil a letter in July 2010 informing them of the test results and requesting that they remove Pennzoil's trademarks and trade dress within two weeks. Miller Oil removed the improper oil, but kept the marks.

B.

This trademark infringement lawsuit followed. After a two-day bench trial, the district court ruled, as relevant to this appeal, that (1) Pennzoil's marks are valid and protectable, and (2) that there was a likelihood of confusion between Miller Oil's marks and Pennzoil's marks, so the use of the latter by the defendants constituted trademark infringement.[6] Next, the

---

[6] The parties do not challenge these conclusions in this appeal.

4

No. 13-20558

district court considered Miller Oil's affirmative defense of acquiescence, ruling that Pennzoil had "implicitly and explicitly assured Pit Stop that the use of the Pennzoil [trademarks and trade dress] were allowed," and that Miller Oil had relied upon Pennzoil's assurances.

Finally, the district court turned to the question of remedy. It issued a limited injunction, ruling that the "[d]efendants are not required to remove the Pennzoil Marks and Trade Dress from the exterior of Pit Stop," and made clear the condition of any continued use:

> Defendants shall be enjoined from using and displaying the Pennzoil Mark and Dress if Pit Stop ceases to promote and feature Pennzoil products, begins to promote another major oil brand, or ceases to purchase Pennzoil products directly from an authorized Pennzoil distributor. In addition, the Court enjoins Defendants from any future erection of exterior signage or building façade containing the Pennzoil Marks or Trade Dress without written authorization from Pennzoil.

II.

We review the district court's factual findings for clear error and its conclusions of law de novo. [7] "When reviewing mixed questions of law and fact, this court reverses only if the findings are based on a clearly erroneous view of the facts or a misunderstanding of the law."[8]

A.

A prima facie trademark infringement case is made out by proof of two elements: that the plaintiff owns a legally protected mark, and there is a likelihood of confusion between her mark and the defendant's mark.[9] Even

---

[7] *Delahoussaye* v. *Performance Energy Servs., L.L.C.*, 734 F.3d 389, 392 (5th Cir. 2013) (citing *Water Craft Mgmt. LLC* v. *Mercury Marine*, 457 F.3d 484, 488 (5th Cir. 2006)).

[8] *Ransom* v. *M. Patel Enters., Inc.*, 734 F.3d 377, 381 (5th Cir. 2013) (citing *Tokio Marine & Fire Ins. Co., Ltd.* v. *FLORA MV*, 235 F.3d 361, 365 (5th Cir. 2001)).

[9] *See, e.g.*, *Bd. of Supervisors for La. State Univ. Agri. & Mech. Coll.* v. *Smack Apparel Co.*, 550 F.3d 465, 474 (5th Cir. 2008); *see also* 15 U.S.C. § 1114(1). In our court, likelihood of confusion is determined by considering eight factors, none of which is either necessary or sufficient. *See Am. Rice, Inc.* v. *Producers Rice Mill, Inc.*, 518 F.3d 321, 329 (5th Cir. 2008).

No. 13-20558

then, the defendant may escape full liability if she can establish an equitable defense, such as laches or, as in this case, acquiescence.[10]

1.

In *Abraham* v. *Alpha Chi Omega*,[11] we held that an acquiescence defense requires the defendant to establish three elements: (1) assurances by the plaintiff that the defendant could use the mark, (2) reliance by the defendant upon those representations, and (3) undue prejudice.[12]

By clarifying that reliance and undue prejudice were both necessary to an acquiescence finding, *Abraham* resolved an ambiguity in our court's doctrine about whether those factors were independent elements or whether they were merely two separate names for the same element. In *Conan Properties, Inc.* v. *Conans Pizza, Inc.*,[13] our circuit's leading case on trademark acquiescence, we were not clear as to the answer. Supporting the idea that the two concepts were separate, we held that "acquiescence involves the plaintiff's implicit or explicit assurances to the defendant which induces reliance by the defendant. As [an] affirmative defense[], the defendant must prove how it will be prejudiced by the plaintiff's . . . implicit or explicit assurances."[14] We also favorably quoted a jury instruction which required the defendant to show "that since th[e] time [that assurances were given], Defendant has built up its business *under the assumption* that it could use the name *so that it would be unjust* to allow Plaintiff to force Defendant to stop using that name now."[15] The phrase "under the assumption" can be read to refer to a reliance factor,

---

[10] *See, e.g.*, *Elvis Presley Enters., Inc.* v. *Capece*, 141 F.3d 188, 205 (5th Cir. 1998).
[11] 708 F.3d 614 (5th Cir. 2013).
[12] *See id.* at 624.
[13] 752 F.2d 145 (5th Cir. 1985).
[14] *Id.* at 153 (internal citations omitted).
[15] *Id.* at 152 n.3 (emphasis added).

while "it would be unjust" can refer to a prejudice component. The construction "so that it would" implies that both elements must be shown.

Later in that same opinion, however, we also held that:

> [Acquiescence ought be found] if the plaintiff's delay or other conduct either induced reliance on the defendant's part or will result in substantial prejudice to the defendant if the plaintiff is permitted to enforce its rights in the trademark. Whether phrased as "reliance" or "prejudice," the effect is the same – the defendant has done something it otherwise would not have done absent the plaintiff's conduct.[16]

The disjunctive "or" indicates that reliance and prejudice are substitute, or perhaps synonymous, elements, rather than both being independently necessary.

Consistent with the latter approach, in our unpublished decision *Coca-Cola Co.* v. *Boston's Bar Supply*, we cited *Conan* for the proposition that acquiescence required the defendant to prove "(1) the plaintiff knew or should have known of the defendant's use of the trademark; (2) the plaintiff made implicit or explicit assurances to the defendant; and (3) the defendant relied on the assurances."[17] Prejudice was nowhere mentioned. Despite this conflict, as a published opinion set against an unpublished one, *Abraham* – not *Coca-Cola* – controls.[18]

Finally, we recognize that our sister circuits have formulated a variety of definitions of trademark acquiescence, each emphasizing different elements.[19] Our court's definition fits comfortably within the spectrum of approaches taken by our fellow appellate courts.

---

[16] *Id.* at 153 (emphasis added).

[17] 190 F.3d 537, 1999 WL 642838 (5th Cir. July 22, 1999) (unpublished) (citing *Conan*, 752 F.2d at 152 n.3.).

[18] *See* 5th Cir. R. 47.5.4; *see also United States* v. *Ybarra*, 289 F. App'x 726, 732 n.33 (5th Cir. 2008) (unpublished).

[19] The Ninth Circuit's standard is perhaps the most similar to our own, involving concepts of both prejudice and reliance. In *Seller Agency Council, Inc.* v. *Kennedy Center for*

No. 13-20558

2.

The undue prejudice prong is at issue in this case. Our court has not defined "undue prejudice" in reviewing a defensive claim of trademark acquiescence. Nonetheless, several lines of precedent implicitly suggest an answer, which we now make explicit: undue prejudice means that the defendant has taken steps such as making significant investment decisions or building the bulk of its business based on the reasonable assumption that it had permission to use the plaintiff's marks, and that such investment or capital would be lost if the defendant could no longer use the mark. It is not

---

*Real Estate Education, Inc.*, 621 F.3d 981 (9th Cir. 2010), the Ninth Circuit held that "[t]he elements of a *prima facie* case for acquiescence are as follows: (1) the senior user actively represented that it would not assert a right or a claim; (2) the delay between the active representation and assertion of the right or claim was not excusable; and (3) the delay caused undue prejudice." *Id.* at 989. The court went on to state that reliance was a component of the prejudice prong, holding that "prejudice in the context of acquiescence inherently must involve reliance on the senior user's affirmative act or deed, and such reliance must be reasonable." *Id.* at 990.

The Second and Eleventh Circuits have both adopted a definition which explicitly requires prejudice, but, at best, only implicitly requires reliance. *See, e.g.*, *SunAmerica Corp.* v. *Sun Life Assurance Co. of Canada*, 77 F.3d 1325, 1334 (11th Cir. 1996) ("The defense [of acquiescence] requires proof of three elements: (1) the senior user actively represented that it would not assert a right or a claim; (2) the delay between the active representation and assertion of the right or claim was not excusable; and (3) the delay caused the defendant undue prejudice."); *Times Mirror Magazines, Inc.* v. *Field & Stream Licenses Co.*, 294 F.3d 384, 395 (2d Cir. 2002) (same).

The Fourth, Sixth, and Tenth Circuits emphasize the importance of affirmative conduct and delay on the part of the plaintiff. *See, e.g.*, *Creative Gifts, Inc.* v. *UFO*, 235 F.3d 540, 547-48 (10th Cir. 2000) ("Acquiescence is an affirmative defense that requires a finding of conduct on the plaintiff's part that amounted to an assurance to the defendant, express or implied, that plaintiff would not assert his trademark rights against the defendant. Acquiescence requires proof . . . that the party seeking to enforce its trademark rights has unreasonably delayed pursuing litigation and, as a result, has materially prejudiced the alleged infringer.") (internal quotation marks and citations omitted); *Kellogg Co.* v. *Exxon Corp.*, 209 F.3d 562, 569 (6th Cir. 2000) (same); *Sweetheart Plastics, Inc.* v. *Detroit Forming, Inc.*, 743 F.2d 1039, 1046 (4th Cir. 1984) (holding that "acquiescence constitutes a ground for denial of relief only upon a finding of conduct on the plaintiff's part that amounted to an assurance to the defendant, express or implied, that the plaintiff would not assert his trademark right against the defendant," but not mentioning prejudice).

enough that the trademark user will bear costs in removing the infringing marks it had been using.

In *Conan Properties* we discussed prejudice in the context of an acquiescence defense, and defined it broadly as when "the defendant has done something it otherwise would not have done absent the plaintiff's conduct."[20] In applying that standard, however, we suggested a conception of "done something" that focused on economic investments made by the defendant. First, we approvingly quoted the district court's jury instruction, which required the jury to find that *"Defendant has built up its business under the assumption that it could use that name* so that it would be unjust to allow Plaintiff to force Defendant to stop using that name now."[21] Second, we struck down a portion of the district court's injunction which had allowed the defendant to use the infringing mark even in geographic areas where it had not yet expanded. We concluded that the defendants could not show that they would be prejudiced if they were barred from entering into areas where they had yet to conduct economic activities.[22] Both factors suggest that some form of *realized*, not *potential*, economic investment made in reliance on the markholder's statements is key to a finding of prejudice.

Jurisprudence in the related equitable defense of laches buttresses this conclusion. We have held that both acquiescence and laches involve the necessary element of undue prejudice, and that both are defined similarly, though perhaps not identically.[23] As such, our definition of undue prejudice in

---

[20] 752 F.2d at 153.

[21] *Id.* at 152 n.3.

[22] *See id.* at 153. The *Conan* court further noted that "practical considerations" justified not extending an acquiescence ruling to areas where no economic investment had occurred stating that "permitting Conans to expand its infringement into geographic areas it has never penetrated would grant Conans an unjustified windfall." *Id.*

[23] *See Abraham* v. *Alpha Chi Omega*, 708 F.3d 614, 624 (5th Cir. 2013).

the laches case law informs our construction of it in the acquiescence context.[24] With respect to laches, we have affirmed jury instructions that focus on whether the defendant had made significant business decisions in reliance on the plaintiff's conduct. This includes, for instance, whether the defendant "makes major business investments or expansions that depend on the use of the marks,"[25] "build[s] up a valuable business around . . . [the plaintiff's] trademark" which would be lost if the mark could no longer be used,[26] or, by foregoing the use of the mark, would have "destroyed the investment of capital in the [business]."[27] We have also looked to the importance of the infringing marks to the overall business, and have affirmed findings of undue prejudice when "the infringing products, while perhaps a small percentage of . . . total sales, drive the sale of [the defendant's] non-infringing products elsewhere."[28]

Equating undue prejudice with some form of "business building" accords with the decisions of our sister circuits. For example, in *University of Pittsburgh* v. *Champion Products, Inc.*,[29] a decision favorably cited by *Abraham*, the Third Circuit looked to whether the defendant "has developed its entire business around one name or product which the senior user then seeks to prohibit it from using or producing."[30] And in *Chattanoga*

---

[24] The distinction between the two defenses involves how the markholder consented to the defendant's use of the mark: "laches denotes a merely passive consent, while acquiescence involves active consent." J. Thomas McCarthy, 6 McCarthy on Trademarks and Unfair Competition § 31:41 (4th ed. 2014). Other circuits have joined ours in blending acquiescence and latches concepts, at least where such elements are not incompatible. *See, e.g.*, *Angel Flight of Ga., Inc.*, v. *Angel Flight Am., Inc.*, 522 F.3d 1200, 1207 (11th Cir. 2008); *Sara Lee Corp.* v. *Kayser-Roth Corp.*, 81 F.3d 455, 462 (4th Cir. 1996).

[25] *Abraham*, 708 F.3d at 624.

[26] *Id.* (quoting 6 McCarthy on Trademarks and Unfair Competition § 31:41 (4th ed. 2001).

[27] *Elvis Presley Enters., Inc.* v. *Capece*, 141 F.3d 188, 206 (5th Cir. 1998).

[28] *Abraham*, 708 F.3d at 625.

[29] 686 F.2d 1040 (3d Cir. 1982).

[30] *Id.* at 1049; *see also id.* at 1048 ("[I]t is simply not true that [defendant] has built up its entire business in reliance on [plaintiff's] inaction.").

*Manufacturing, Inc.* v. *Nike, Inc.*,[31] the Seventh Circuit found dispositive the fact that the defendant had "spent millions of dollars annually promoting its [plaintiff]-endorsed products and has acquired a position as a market leader."[32] Other circuits have similarly focused on whether the defendant had engaged in significant business development activities in reliance on the use of the protected mark.[33]

We close with one important qualification: while a defendant may be prejudiced if it relies on the plaintiff's mark to *expand* its business, prejudice is rarely, if ever, found merely because the defendant has *used* the infringing mark in commerce (or spent money on products which use the mark).[34] This makes sense – if use itself could satisfy the undue prejudice prong, that element would be rendered moot.[35] For the same reason, the costs of removing

---

[31] 301 F.3d 789 (7th Cir. 2002).

[32] *Id.* at 795.

[33] *See, e.g.*, *Ray Commc'ns, Inc.* v. *Clear Channel Commc'ns, Inc.*, 673 F.3d 294, 305 (4th Cir. 2012) ("A defendant suffers economic prejudice when it relies on the trademark owner's inaction by developing a valuable business around the trademark."); *Bridgestone/Firestone Research, Inc.* v. *Auto. Club De L'Ouest De La France*, 245 F.3d 1359, 1363 (Fed. Cir. 2001) ("Economic prejudice arises from investment in and development of the trademark, and the continued commercial use and economic promotion of a mark over a prolonged period adds weight to the evidence of prejudice."); *Saratoga Vichy Spring Co., Inc.* v. *Lehman*, 625 F.2d 1037, 1042 (2d Cir. 1980) (holding that "defendant's entry into a new business in reliance on plaintiff's acquiescence in the validity of the trademark" can justify relief). In this context, economic prejudice looks at the impact on the business development activities of the defendant, such as whether it "deployed investment capital." *Pro Football, Inc.* v. *Harjo*, 565 F.3d 880, 884 (D.C. Cir. 2009). This is in contrast to trial prejudice, not at issue here, which focuses on a loss of evidence or witnesses caused by the time delay. *See id.* at 883.

[34] *See Tisch Hotels, Inc.* v. *Americana Inn, Inc.*, 350 F.2d 609, 615 (7th Cir. 1965) ("If . . . prejudice could consist merely of expenditures in promoting the infringed name, then relief would have to be denied in practically every case of delay."); *see also Internet Specialties West, Inc.* v. *Milon-DiGiorgio Enters., Inc.*, 559 F.3d 985, 991-92 (9th Cir. 2009) (same).

[35] Similarly, customer goodwill can be considered to determine the economic impact of forbidding the defendant from using the mark, but is not itself a valid measure of prejudice in the absence of a concurrent finding that the goodwill stemmed from economic investment made in reliance on the plaintiff's representations. In this sense, to be cognizable, goodwill must be the output of the economic activity taken in reliance on the plaintiff – merely building

11

No. 13-20558

the infringing marks would not ordinarily factor into the undue prejudice analysis.[36]

## B.

Set against this standard, Miller Oil's arguments fall short. The district court made no findings about whether Miller Oil suffered undue prejudice because of its reliance on Pennzoil's statements. Without this determination, the court's conclusion that Miller Oil had succeeded in mounting its acquiescence defense fails as a matter of law.

Nor does the record support the argument that the court implicitly found undue prejudice. On appeal, Miller Oil raises two claims of prejudice: (1) the disruption that Pit Stop suffered during the re-image process, and (2) Pit Stop's loss of identity allegedly suffered after the re-image, including changes in its color scheme, trade dress, and the prominence in its name. We can quickly dispatch the first argument. Undue prejudice concerns economic investments made by the defendant in reliance on promises made by the plaintiff – it does not include the costs of producing the infringing products or, as here, the incidental effects stemming from their creation. Even were we to conclude that the cost of the re-image could be considered in the undue prejudice analysis, those costs were primarily borne by Pennzoil, not Miller Oil – and we look to the defendant's expenses, not the plaintiff's. While Miller Oil did pay to repaint the interior of the store, and suffered disruption during the re-image process, that disruption does not rise to the level we have previously held

---

goodwill through continued use of the mark, without additional economic investment, is not sufficient for a finding of acquiescence.

[36] *See, e.g., Ironclad, L.P.* v. *Poly-America, Inc.*, No. 3:98-CV-2600, 2000 WL 1400762, at *13-14 (N.D. Tex. July 28, 2000) (recognizing that "the added costs of the name change" did not demonstrate sufficient prejudice).

cognizable.[37]  Moreover, as we have held, the costs of removing an infringing product are not considered in an undue prejudice analysis.

Miller Oil next argues that it suffered a loss of identity because of the re-image, such that it became a store branded as "Pennzoil," not "Pit Stop," and that it was prejudiced as a result.  The problem with this argument is that while there is evidence in the record that Pit Stop's identity changed after the re-image,[38] there is nothing to indicate the commercial or economic consequences of that change.  Miller Oil does not proffer evidence of, for example, changes in its customer base, higher profits, or new business opportunities it was able to exploit because of the re-brand.[39]  Given that the defendant in a trademark infringement case bears the burden of establishing the elements of an acquiescence defense,[40] we conclude that Miller Oil has failed to make the necessary showing of undue prejudice, and as a consequence, its trademark acquiescence defense must fail.

### III.

The last issue to address is whether, in light of our conclusion that Miller Oil failed to successfully assert an acquiescence defense, the district court's injunction can stand as written.  It cannot.

---

[37] Recall that we have equated undue prejudice with "making major business investments" in reliance on the assumption that the defendant could use the mark, which would be lost if the mark could no longer be used, *Abraham* v. *Alpha Chi Omega*, 708 F.3d 614, 624 (5th Cir. 2013), or situations where "[c]hanging the name of the [business] would have destroyed the investment of capital in the [business]," *Elvis Presley Enters., Inc.* v. *Capece*, 141 F.3d 188, 206 (5th Cir. 1998).  Closing Pit Stop for a weekend and paying to paint the inside of the facility does not meet this benchmark.

[38] At trial, Pit Stop's general manager affirmatively answered the question: "Now, you just said that they, basically, took away your Pit Stop image and put on a Pennzoil image?"

[39] We do not suggest that there must always be mathematical quantification of the economic consequences of trademark acquiescence.  There must, however, be more than mere speculation.

[40] *Conan Properties, Inc.* v. *Conans Pizza, Inc.*, 752 F.2d 145, 153 (5th Cir. 1985).

No. 13-20558

A.

We review the grant of injunctive relief for abuse of discretion.[41]  The district court abuses its discretion when it "(1) relies on clearly erroneous factual findings . . . (2) relies on erroneous conclusions of law . . . , (3) or misapplies the factual or legal conclusions when fashioning its injunctive relief."[42]

B.

As a consequence of its acquiescence determination, the district court fashioned the following conditional injunction, ordering:

> [T]hat Defendants shall discontinue the use and display of the Pennzoil Marks and Trade Dress at issue in this case by Pit Stop *unless* Pit Stop continues to promote and feature Pennzoil products, does not advertise or promote another major oil brand, and purchases products directly from a Pennzoil authorized distributor.  In the event that any signage is damaged and cannot be repaired such signage shall be removed by Defendants within 30 days of such damage and shall not be replaced with signage containing the Pennzoil Mark or Trade Dress without the express written permission of Pennzoil.

Pennzoil challenges the part of the injunction allowing Miller Oil to continue to use the Pennzoil marks so long as it complied with certain conditions, a remedy the district court specifically fashioned because it had determined that Pennzoil had acquiesced to Miller Oil's use of its marks.

Given that Miller Oil did not establish undue prejudice, the district court's legal conclusion that Pennzoil had acquiesced was error.  "An abuse of discretion automatically inheres in an injunctive decree if the trial court misinterpreted applicable law."[43]  Allowing Miller Oil to continue to display Pennzoil's marks in light of an unchallenged determination of trademark

---

[41] *Abraham*, 708 F.3d at 620.

[42] *Peaches Entm't Corp.* v. *Entm't Repertoire Assocs.*, 62 F.3d 690, 693 (5th Cir. 1995).

[43] *Westchester Media* v. *PRL USA Holdings, Inc.*, 214 F.3d 658, 671 (5th Cir. 2000).

No. 13-20558

infringement would be the type of "unjustified windfall" we have previously condemned.[44]  We vacate the section of the injunction allowing Miller Oil to use Pennzoil's marks under specific conditions, and affirm the section of the injunction requiring Miller Oil to discontinue the use of the marks.

IV.

We REVERSE the decision of the district court finding acquiescence and VACATE the elements of the injunction allowing Miller Oil to use Pennzoil's marks.

---

[44] *Conan Properties, Inc.* v. *Conans Pizza, Inc.*, 752 F.2d 145, 153 (5th Cir. 1985).